FANTIS FOODS, INC., Plaintiff, v STANDARD IMPORTING CO. INC., et al., Defendants.

STANDARD IMPORTING CO. INC., Respondent, v SYNERGAL, LTD., Appellant.

First Department, June 27, 1978

## APPEARANCES OF COUNSEL

*David P. Langlois* of counsel *(Leo G. Kailas* with him on the brief; *Milgrim Thomajan & Jacobs, P. C.,* attorneys), for appellant.

*Murray I. Sommer* of counsel *(Sommer & Sklar,* attorneys), for respondent.

## OPINION OF THE COURT

LUPIANO, J.

Defendant Standard Importing Co., Inc., a domestic (NY) corporation with principal offices in New York City, is an importer, wholesaler and distributor in the United States of foreign cheeses and other food products. Plaintiff Fantis Foods, Inc., a domestic (NY) corporation with principal offices in New York City, is a local competitor of Standard. Fantis initiated suit against Standard and others in the Supreme Court of the State of New York, alleging, *inter alia,* that it purchased 300 barrels of Greek feta cheese from Synergal, Ltd., a corporation located in and doing business in Greece on or about August 6, 1976; that while the goods were in transit from Greece to New York, Synergal as shipper provided for surrender of the documents evidencing their ownership to Fantis; that upon arrival of the cheese in New York, Fantis on presentation of its documents evidencing ownership, was refused delivery, the goods having been "wrongfully" appropriated by Standard. This conversion of the 300 barrels of cheese by Standard is therefore alleged to have occurred in New York.

Standard in its answer by way of affirmative defenses and

counterclaims asserts that the 300 barrels of feta cheese were part of a purchase by it pursuant to contract dated July 26, 1976 of 1,200 barrels of feta cheese from Synergal, Ltd., f.o.b. Piraeus, Greece. Synergal at the time in issue was the sole or dominant seller and exporter of feta cheese made in Greece. On or about July 24, 1976, in compliance with the contract, Standard established an irrevocable credit of $150,000 in favor of Synergal and guaranteed payment of the cheese. Standard asserts that Synergal converted this cheese by subsequently selling it to Fantis and arranging for its transfer to Fantis in New York, but that as to the first 300 barrels, Standard frustrated the scheme by obtaining this first shipment. Defendant Standard commenced a third-party action against Synergal seeking to recover damages, compensatory and punitive.

Synergal, Ltd., moved to dismiss Standard's third-party complaint on the grounds that "(1) no basis exists for the [court's] exercise of in personam jurisdiction over Synergal, and (2) Standard and Synergal agreed to resolve all disputes in the courts of Greece." Special Term denied the motion, observing as follows: "Delivery of the cheese was taken by Standard in Greece, its trademark was stamped on the cheese and 300 of 1200 barrels were actually shipped. The other 900 barrels were, having been weighed, analyzed and stamped with the trademark, segregated and held at Synergal's factory pending shipment. After the 300 barrels were shipped, and copies of the shipping documents given to Standard's Greek agent, Synergal arranged to have the shipment diverted and the *original* shipping documents sent to the plaintiff. The 900 barrels Synergal shipped to the plaintiff." This presentation relied on by Special Term is gleaned from the facts as pleaded and alleged. Synergal does not dispute this presentation, but contends that under same, Standard's only claim is for breach of contract; that the requirements for in personam jurisdiction over Synergal have not been met under CPLR 302 (subd [a], par 3, cl [ii]), and that the contractual forum selection clause must control.

CPLR 302 (subd [a], par 3, cl [ii]) provides that "a court may exercise personal jurisdiction over any non-domiciliary * * * who * * * commits a tortious act without the state causing injury to person or property within the state * * * if he * * * expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from

interstate or international commerce". Standard's claim against Synergal clearly sounds in tort and not in (breach of) contract. The contract between Standard and Synergal provided that the sale price is $2,500 per ton f.o.b. Piraeus, that "[f]rom the time it leaves the factory, the cheese is the responsibility of the Buyer" and that "[d]elivery of [c]heese: [w]ill take place in the * * * Factory or the Refrigerated Warehouses". The 1,200 barrels being marked with Standard's trademark "SICO," weighed and segregated as its property, Standard accepted delivery by giving its certificate attesting to weight and physical composition. Standard as owner directed Synergal to ship the cheese in four weekly successive shipments of 300 barrels each. Synergal's subsequent attempt, as alleged by Standard, to convey the 1,200 barrels to Standard's competitor Fantis, arose *after* Standard became entitled to rightful possession of all 1,200 barrels and amounted to a conversion (the effort succeeding as to the 900 barrels).

The crux of the instant appeal is whether the alleged tortious act committed by Synergal, a nondomiciliary, outside the State of New York caused injury within the State. As to the first shipment of 300 barrels, the conversion occurred in New York assuming Fantis was entitled to the goods. If Standard took possession of its own goods, there was no conversion by it and Synergal's actions in Greece did not deprive Standard of these 300 barrels. As to the remaining 900 barrels, the alleged conversion by Synergal occurred while the goods were in Greece. Of course, it is not axiomatic that in conversion, the tortious act and the tortious injury coalesce, and proper analysis of the applicability of the long-arm statute must perforce be based not on abstract principles, but on the particular circumstances of an individual case. The most essential condition is that there be an injury in New York. Addition of the 1966 amendment embodying CPLR 302 (subd [a], par 3) marked a legislative departure from the overly restrictive rationale of *Feathers v McLucas* (15 NY2d 443) and indicated the viability of the holding of the Illinois Supreme Court in *Gray v American Radiator & Std. Sanitary Corp.* (22 Ill 2d 432).

"Clause (ii) of subparagraph (3) was constructed by the Judicial Conference from several sources. It is perhaps the most important provision in the 1966 amendment. Whether a state may constitutionally assert jurisdiction over a nonresident defendant who performs acts outside the state resulting

56

in consequences in New York has been the focus of much academic discussion * * * Some courts have found no constitutional impediment where the defendant can reasonably foresee that his out-of-state act will have an in-state consequence. See *Gray v. American Radiator & Standard Sanitary Corp.* * * * Others have boggled at the concept of foreseeability * * * Balancing these competing considerations, the new statute attempts to strike a compromise. A defendant who foresees consequences in New York will be held accountable for those consequences only where he 'derives substantial revenue from interstate or international commerce.' * * * While the protections of the foreseeability rules are ephemeral * * * the safeguards built into the interstate or international character of the defendant's operations are * * * reassuring" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR, C302:24). The test of foreseeability embodied in the statute is an objective one, to wit, whether the nondomiciliary, viewed as one endowed with reasonable prudence, should expect the tortious act which he commits to have consequences in New York *(Allen v Auto Specialties Mfg. Co.,* 45 AD2d 331; see, also, *Markham v Gray,* 393 F Supp 163).

■ The instant appeal involves an alleged conversion out of State in the commercial area by a nondomiciliary which tortious act has consequences in New York. The nondomiciliary, it is alleged, possessed a monopoly or virtual monopoly at the relevant time over the sale and exportation of Greek feta cheese. Consequently, in dealing with Standard and Fantis, importers of foreign food and cheese items who are local competitors, the nondomiciliary, Synergal was in a unique position to control the competitive relationship between Fantis and Standard insofar as this type of cheese is concerned. Accordingly, the tortious injury to Standard in consequence of the conversion by Synergal produced ramifications in New York which were occasioned not by the mere fact that Standard had its principal office here, but by numerous additional facts. Applying the reasonable man standard in the sense of foreseeability to the actions of Synergal, it must be concluded on this record that long-arm jurisdiction over this nondomiciliary exists by virtue of CPLR 302 (subd [a], par 3, cl [ii]).

To reiterate, injury to Standard in New York was foreseeable by Synergal not merely because Standard is incorporated in and has its principal office in New York (cf. *Friedr. Zoellner*

*[N. Y.] Corp. v Tex Metals Co.,* 396 F2d 300), but because Synergal by virtue of its monopolistic control in its dealings with Standard and its New York competitor Fantis must be deemed to foresee consequences of its actions in New York. In light of Synergal's substantial revenue from international commerce, undisputed for purposes of the motion to dismiss Standard's third-party action, the aptness of viewing such actions by Synergal as a basis for long-arm jurisdiction is self-evident. We need not, therefore, concern ourselves with the propriety of the rationale of those Federal cases which opine that in commercial tort situations involving conversion, "the injury must be deemed to occur in the place where the defendant's acts respecting the property are committed" *(Chemical Bank v World Hockey Assn.,* 403 F Supp 1374, 1380; *American Eutectic Welding Alloys Sales Co. v Dytron Alloys Corp.,* 439 F2d 428). However, it may be noted that these cases rely in part on *Friedr. Zoellner (N. Y.) Corp. v Tex Metals Co. (supra),* and betray an inordinate concern that CPLR 302 (subd [a], par 3) had its inception in the 1966 legislative response to the interpretation given CPLR 302 (subd [a], par 2) by the New York Court of Appeals in *Feathers v McLucas* (15 NY2d 443, *supra).* Viewing the statute as primarily aimed at negligence type situations involving personal injuries or property damage, the approach opted for by the afore-mentioned Federal cases is to distinguish commercial tort type situations, and insofar as conversion is concerned, to restrict in severe fashion the operative effect of the long-arm statute. It may well be that the protective features of New York's long-arm statute regarding foreseeability and the deriving of substantial revenue from interstate or international commerce have been undervalued or unappreciated.[1] It suffices to state in the context of the present record that CPLR 302 (subd [a], par 3, cl [ii]) draws no distinction between commercial and noncommercial type situations.[2]

---

1. "Professor Reese in a study prepared for the Judicial Conference, to be included in the Eleventh Annual Report of the Judicial Conference (1966), concluded 'that a state does not have constitutional authority to exercise jurisdiction over a non-resident who causes tortious injury within the state by an act or omission without the state unless the non-resident intended the act to have consequences within the state, or had reason to foresee that the act would have such consequences, or had such other contacts with the state as would make it reasonable for the state to exercise jurisdiction over him' " (1 Weinstein-Korn-Miller, NY Civ Prac, par 302.03, n 23).

2. Synergal's alleged conversion of the 900 barrels of feta cheese not only resulted in the damages arising from the loss of that cheese, but may also be viewed as causing Standard to lose profits from the sales of Greek feta cheese in general, since

Synergal for the first time on appeal asserts that CPLR 302 (subd [a], par 3) is violative of the due process clause under the circumstances presented by this record and is thus constitutionally deficient.

"Statutes and ordinances are not unconstitutional in the abstract, so to speak, but are presumptively constitutional. Their unconstitutionality can be determined only in an action where the question is raised by a party aggrieved. [Citation] The question must be raised by a pleading or on the trial, or the right to raise the question is lost, for it cannot be raised for the first time on appeal" *(Jahn v Berzon,* 255 App Div 1023, 1024; see, also, *Dodge v Cornelius,* 168 NY 242, 244-245).[3]

■ Reliance by Synergal on the forum selection clause in the contract between it and Standard is misplaced. The clause provides: "emphatically and without reservation, it is agreed upon by the two parties that for any eventual difference or discord of any nature and for whatever objections that may arise from the present agreement, the authorized court for the solution to the differences is the Court of Greece exclusively." Although this clause would be applicable respecting a claim brought in contract, it has no application to Standard's claim which sounds in the tort of conversion. The alleged conversion by Synergal subsequent to the contract constitutes an undisputed act not arising out of the contract. Recognition that the contract created the property rights which were violated by Synergal's conversion does not render indistinct the fact that the conversion is a dispute outside of that contract (see *Hodom v Stearns,* 32 AD2d 234; cf. *Altshul Stern & Co. v Mitsui Bussan Kaisha,* 385 F2d 158). We do not perceive the instant dispute between Standard and Synergal as one embraced within the intendment of the forum selection clause (see *Reavis v Exxon Corp.,* 90 Misc 2d 980).

Further, the bargaining position of Synergal in determining whether to give effect to a contractual provision which ousts our courts from jurisdiction (see *Kyler v United States Trotting Assn.,* 12 AD2d 874; see, also, *Export Ins. Co. v Mitsui*

delivery to Fantis, Standard's local competition and the sole importer of such cheese for the period involved, assured that Standard would have no sales in this respect for that period. In this light the conversion directly injured Standard in its economic relations in New York.

3. Synergal's argument, viewed as one asserting that the long-arm statute is unconstitutional as applied to it, is waived by the failure to assert it at Special Term. However, were we to consider such argument, we would find it to be without merit (see 1 Weinstein-Korn-Miller, NY Civ Prac, par 302.03).

*S. S. Co.,* 26 AD2d 436, 437). Under the circumstances as presented by the record, it does not appear that it would be right and proper to enforce the forum selection clause.

Accordingly, the order of the Supreme Court, New York County (BAER, J.), entered May 5, 1977, which denied the third-party defendant Synergal, Ltd.'s motion to dismiss the third-party complaint against it for, *inter alia,* lack of in personam jurisdiction, should be affirmed, with costs and with disbursements.

SULLIVAN, J. (dissenting). At issue is the application of the long-arm provisions of CPLR 302 (subd [a], par 3, cl [ii]) to the tort of conversion alleged to have been committed out of State with resultant economic loss within.

Standard, a New York corporation with offices in New York City and Chicago, is an importer, wholesaler and American distributor of cheeses and other food products produced in foreign countries. Synergal is a co-operative association of Greek dairy producers and processors organized under the laws of Greece with offices in Athens, Greece. It conducts no business in New York and has no offices, employees or assets here. Its dairy products are produced in Greece, and all of its sales contracts, including that in question here, are made in Greece. Synergal does not advertise or promote its products in the United States.

Standard alleges that on July 26, 1976, it entered into a written contract with Synergal for the purchase of 1,200 barrels of Greek feta cheese, f.o.b. Piraeus. The contract was negotiated and signed in Greece by Standard's agent, who maintains an office for Standard in Athens. Standard alleges that on August 14, 1976, pursuant to the contract, 1,200 barrels were marked with Standard's trademark, weighed and segregated in Greece. Standard further alleges that, in an acknowledgment of receipt, it surrendered its certificate of weight and quality. Thereafter, Standard directed Synergal to ship the cheese in four successive, weekly lots of 300 barrels each.

In further compliance with the contract, payment was to be effected in Greece. Standard contends that it established an irrevocable credit of $150,000 for the full purchase price upon which Synergal could draw and as a guarantee of payment.

A bill of lading was issued, consigned to the order of a New York bank for the initial shipment of 300 barrels, naming

Standard as the party to be notified, and listing Chicago, Illinois, as the place of delivery. Standard claims that that Synergal "wrongfully substituted" Fantis Foods, Inc., a New York corporation, as the purchaser on the original bill of lading. Nonetheless, Standard did obtain possession of the initial shipment of 300 barrels. The remaining 900 barrels were delivered to Fantis. Fantis thereafter instituted this action for damages because of Standard's alleged unlawful refusal to relinquish the initial shipment of 300 barrels. Standard impleaded Synergal which, contending it has no presence herein for jurisdictional purposes, challenges the power of the New York courts to exercise jurisdiction over it.

In its third-party complaint, which sets forth a cause of action against Synergal in both tort and contract, Standard alleges that Synergal has committed a breach of its contract and a conversion by interfering with Standard's rights to the initial 300-barrel shipment, by failing to ship the remaining 900 barrels to Standard, and by refusing to accept payment. Synergal did not answer but instead moved to dismiss.

Synergal's motion was based on lack of personal jurisdiction, and the contract's forum selection clause, which requires resolution of all disputes in Greece: "Also, emphatically and without reservation, it is agreed upon by the two parties that for any eventual difference or discord of any nature and for whatever objections that may arise from the present agreement, the authorized court for the solution to the differences is the Court of Greece exclusively."

Recognizing that there was no basis upon which to subject Synergal, a foreign corporation with no presence in New York (see *Tauza v Susquehanna Coal Co.,* 220 NY 259, 276), to personal jurisdiction on a "doing business" theory under CPLR 301, or on a "transacting business" theory under CPLR 302 (subd [a], par 1), Standard invoked the court's long-arm jurisdiction under CPLR 302 (subd [a], par 3) by casting as a tort, what, it seems clear to me, is really a breach of contract. The alleged tort is pleaded as follows: "Synergal, deliberately failing to avail itself of the established letter of credit, wrongfully substituted Fantis as the ostensible purchaser of all the cheese, interfered with Standard's lawful rights of possession, dominion and control of the initial shipment, and withheld the remaining 900 barrels of cheese from Standard despite its demand therefor."

The identical facts are pleaded as the basis of the breach of

contract action against Synergal. Shorn of its rhetorical surplusage, Standard's claim against Synergal is for 900 barrels of cheese for which it bargained and which was the consideration for the irrevocable letter of credit Standard claims to have established.

Courts look with disfavor upon attempts to convert a breach of contract cause of action into a tort for jurisdictional purposes. (See *Amigo Foods Corp. v Marine Midland Bank— N.. Y.,* 39 NY2d 391; *Stanat Mfg. Co. v Imperial Metal Finishing Co.,* 325 F Supp 794.) It should be noted that in a proceeding pending in the United States District for the Northern District of Illinois, Standard's assistant secretary stated in an affidavit: "Synergal's new instructions were in fact, we are informed, that the documents were to be turned over to Fantis Foods instead of SICO [Standard] which was and is a flagrent *[sic]* breach of the agreement between SICO and Synergal."

The same affiant had also stated earlier in support of an order of attachment: "SICO [Standard] has furthermore just learned that the 900 barrels of feta cheese which Synergal has refused to ship to SICO have been in fact shipped * * * to Fantis Foods in New York although such cheese is still the property of Synergal at this time because presentation of documents for such cheese and payment therefore *[sic]* has not as yet been made." This dexterity in pleading allegations to meet the exigency of the moment compels scrutiny of Standard's claim before we readily accept the tort label which it has affixed to the cause of action.

The only justification offered by Standard for the assertion of a tort claim is the allegation that after the cheese was weighed, segregated, and accepted at the warehouse in Greece there was a "delivery" to Standard. If title and possession remained in Synergal, no conversion occurred. Whether there was delivery or transfer of title in Greece involves a question of Greek law. Confessing to some unfamiliarity with the nuances of Greek law, I would be reluctant, from these facts, to assume, for purposes of disposition of the jurisdictional question, that a conversion occurred in Greece. In this connection, the fact that Synergal may be vindicated after a trial on the torts claim provides little solace. Synergal would have proven its point only after having first been subjected to the burden of defending itself in a forum which had no jurisdiction over it.

This dissent, however, is based on other gounds. Assuming, *arguendo,* that Synergal converted 900 barrels of Standard's cheese in Greece and interfered with Standard's right of possession as to the initial shipment, it is difficult to perceive how this tortious act, conceded to have been committed outside the State, was the cause of "injury to person or property within the state", so as to invoke the long-arm provision of CPLR 302 (subd [a], par 3, cl [ii]), which permits a court to "exercise personal jurisdiction over any non-domiciliary * * * who in person or through an agent * * * 3. commits a tortious act without the state causing injury to person or property within the state * * * if he (ii) expects or should reasonably expect the act to have consequences in the state and derived substantial revenue from interstate or international commerce".

In rejecting a similar claim of jurisdiction on an alleged conversion occurring outside the State, the court in *Friedr. Zoellner (N. Y.) Corp. v Tex Metals Co.* (396 F2d 300, 303) stated: "Zoellner lost its scrap metal in New Orleans. The process of reasoning by which Zoellner seeks to convert this New Orleans injury into an injury within New York defies restatement. However, even if it is assumed that some injury in New York flowed from the New Orleans injury, jurisdiction would be lacking. Section 302(a)(3) is not satisfied by remote or consequential injuries which occur in New York only because the plaintiff is domiciled, incorporated or doing business in the state."

Allegations of economic injury, similar to those made here, were also rejected as a basis for jurisdiction in *Lehigh Val. Inds. v Birenbaum* (527 F2d 87, 94): "Section 302(a)(3) makes an initial requirement that the tortious activity outside New York results in injury to 'person or property within the state.' This court in construing the section has squarely held that the injury in New York must be direct and not remote or consequential. The appellants claim that the alleged destruction by [defendant] * * * resulted in a loss of profits to Lehigh's stockholders. We have held that § 302(a)(3) is not satisfied by remote or consequential injuries such as lost commercial profits which occur in New York only because the plaintiff is domiciled or doing business here."

The enactment of paragraph 3 of subdivision (a) was a legislative response to the decision of the Court of Appeals in *Feathers v McLucas* (15 NY2d 443) which denied jurisdiction

for an act committed outside the State even though it caused serious injury within the State. (See McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C302:17, p 86; C302:19, p 87.)

From the effective date of the amendment adding paragraph 3 until the majority's holding here, those courts which have considered the question of whether a conversion occurring outside the State caused "injury to property within the state" have, with only one exception,* rejected the claim of jurisdiction based on the claim of in-State injury.

In *Chemical Bank v World Hockey Assn.* (403 F Supp 1374, 1380) the court, in refusing to find jurisdiction under 302 (subd [a], par 3) on a claim of conversion and wrongful interference with a contract occurring outside the State, despite allegations that negotiations and loan agreements were actually entered into in New York stated: "in a commercial tort situation the place of the injury will usually be deemed to be the place where 'the critical events associated with the dispute took place' * * * Moreover, in connection with the tort of conversion the injury must be deemed to occur in the place where the defendant's acts respecting the property are committed."

The rejection of jurisdiction in this line of Federal cases is not based, as the majority believes, on the fact that the claim asserted did not fit within the traditional mold of the personal injury or property damage action. Rather, jurisdiction was denied because the injury which flowed from the alleged tortious conduct did not occur in New York.

In each instance, as here, the damage coalesced with the tortious act. Of course, the loss, be it loss of profit or business, manifests itself wherever the plaintiff can show a domicile or a ledger. But the plaintiff's fortuitous presence in New York, while creating a color of injury here, does not transport the injury from the place of occurrence to the place of domicile.

---

* In *General Motors Acceptance Corp. v Richardson* (59 Misc 2d 744), a Pennsylvania auctioneer sold an automobile in which the plaintiff held a security interest. The plaintiff sued for conversion. The court held that there was jurisdiction. Professor McLaughlin has commented: "The conclusion reached by the court seems to assume that if the plaintiff is in New York when the injury occurs, the injury must occur in this state. The potential of so sweeping a doctrine is enormous, and it is suggested, in many cases would violate due process." (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C302:20, p 88.) *General Motors Acceptance* was criticized in *Security Nat. Bank v Ubex Corp.* (404 F Supp 471, 474, n 7).

While Standard may have suffered some loss in New York, in the sense that a sale lost anywhere affects its profits here, that injury is purely the result of Standard's domicile here. Such injury is too remote to sustain jurisdiction. (See *American Eutectic Welding Alloys Sales Co. v Dytron Alloys Corp.,* 439 F2d 428, 433; *Friedr. Zoellner [N. Y.] Corp. v Tex Metals Co.,* 396 F2d 300, 303, *supra; Black v Oberle Rentals,* 55 Misc 2d 398; *Security Nat. Bank v Ubex Corp.,* 404 F Supp 471, *supra.)* The claim that Synergal, by converting the cheese, gave Standard's New York domiciled competitor, Fantis, an unlawful advantage, simply does not provide an extraterritorial dimension to the loss so as to create a jurisdictional basis in New York. It is as remote an "injury" as is the loss of profit on the corporate ledger.

The majority's ruling would subject any tort-feasor doing business anywhere in the world to jurisdiction in New York solely because the plaintiff, by virtue of its domicile, suffers a financial loss here. This is indeed a tenuous minimum contact with New York, and is constitutionally deficient to serve as the nexus with this State so that the maintenance of the suit does not offend " 'traditional notions of fair play and substantial justice.' " *(International Shoe Co. v Washington,* 326 US 310, 316.)

Since there was no "injury" in New York, there is no reason to reach the second requirement of section 302 (subd [a], par 3, cl [ii]), that the defendant "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce", except to make one observation. The majority's ready acceptance of Synergal's capacity to foresee the consequences of its acts in New York is based on Standard's domicile there and Synergal's "monopolistic control in its dealings with Standard and its New York competitor Fantis", which is simply a variation of the same theme, domicile. Of far greater significance, it would seem is the fact that delivery of the 1,200 barrels was to be made in Chicago, where Standard maintains offices. In fact, the initial shipment, at Standard's request, was consigned and delivered to Chicago.

In view of the foregoing, there is no need to determine whether the forum selection clause should be enforced so as to deny jurisdiction to our courts. But in any event, Standard cannot avoid the forum selection clause merely by pleading a tort, since it relies on the contract as the basis for the rights it

asserts in the cheese. It should not be allowed to assert the contract in those parts supportive of its claim, and reject those that are not, by a simple labeling device, thereby bypassing a forum selection clause that emphatically states: "any eventual difference or discord of any nature and for whatever objections that may arise from the present agreement, [shall be submitted to] * * * the Court of Greece exclusively." (See *Altshul Stern & Co. v Mitsui Bussan Kaisha,* 385 F2d 158.)

It may well be that other reasons compel the rejection of the clause. Whatever early judicial reluctance there may have been to the enforcement of such clauses clearly has been dissipated by the United States Supreme Court in *Scherk v Alberto-Culver Co.* (417 US 506, 518, reh den 419 US 885): "Two Terms ago * * * we rejected the doctrine that a forum-selection clause of a contract, although voluntarily adopted by the parties, will not be respected in a suit brought in the United States ' "unless the selected state would provide a more convenient forum than the state in which suit is brought." ' * * * Rather, we concluded that a 'forum clause should control absent a strong showing that it should be set aside.' " Standard offers the bald assertion of unconscionability, but has failed to make the requisite "strong showing" that the clause should be set aside.

Accordingly, I would reverse and grant Synergal's motion to dismiss the third-party complaint against it for lack of personal jurisdiction.

KUPFERMAN, J. P., and LANE, J., concur with LUPIANO, J.; SANDLER and SULLIVAN, JJ., dissent in an opinion by SULLIVAN, J.

Order, Supreme Court, New York County, entered on May 5, 1977, affirmed. Respondent shall recover of appellant $60 costs and disbursements of this appeal.