**KUWAIT AIRWAYS CORPORATION, Plaintiff,**

v.

**OGDEN ALLIED AVIATION SERVIC-ES, formerly Ogden Food Service Corp., Defendant.**

No. CV 87–1365.

United States District Court, E.D. New York.

Nov. 30, 1989.

Michael J. Holland, Condon & Forsyth, New York City, for plaintiff.

Michael Caulfield, White, Fleischner & Fino, New York City, for defendant.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

This case arises out of a fender bender between two rather extraordinary fenders: one attached to a truck of the type used to hoist meals onto aircraft, the other on a Boeing 747. Because the parties who owned the vehicles involved in the collision are of diverse citizenship, and the amount in controversy exceeds the statutory minimum, this Court has jurisdiction.

### I.

On May 29, 1984, a Boeing 747 aircraft owned and operated by plaintiff was, while parked at John F. Kennedy International Airport, struck by a truck owned and operated by defendant. Defendant has admitted liability for the accident and stipulated to the amount of damages for actual costs of repairing plaintiff's aircraft and accommodating plaintiff's passengers who were inconvenienced by the accident. The only dispute remaining between the parties is whether plaintiff is entitled to any damages for temporary loss of use of the aircraft and, if so, what the measure of those damages should be.

There is no question that the damaged aircraft was out of service for several days while repairs were being made.[1] Plaintiff argues that this fact, coupled with defendant's admission of liability, entitles plaintiff to an award of damages for loss of use of the aircraft. Plaintiff moves for partial summary judgment establishing that the measure of its loss of use damages is the reasonable rental value of a replacement 747 for the time during which plaintiff's 747 was out of service.

Plaintiff concedes, however, that it did not actually rent a replacement 747. In fact, it appears that plaintiff was able to service all of the grounded plane's flights by using an A300 Airbus that was in plaintiff's fleet and was not otherwise engaged.[2] Defendant submits evidence that, because no flights were cancelled and the Airbus had sufficient capacity to seat all passengers who would have flown on the grounded 747, plaintiff suffered no lost profits—and may indeed have benefitted financially—as a result of the 747's grounding. Absent an actual pecuniary loss resulting from the accident, defendant contends, there can be no recovery of damages for loss of use of the jumbo jet.

■ The present motion thus requires the Court to decide whether proof of actual pecuniary loss is required in order to recover for loss of use of a damaged chattel, and whether the reasonable cost of securing a replacement for the damaged chattel may be recovered even if no substitute is actually rented.[3] There are undoubtedly disputed, material issues of fact regarding the *amount* of loss of use damages suffered by plaintiff in this case—for example, the number of days the plane was out of service, the appropriate rental fee, and the relative net operating profit of the Airbus as compared to that of the 747. However, the appropriate *measure* of those damages—in effect, the decision whether the rental fee and operating profit are even relevant to determining damages in the factual context of this case—is purely a question of law that is appropriately addressed on a motion for summary judgment.

---

**1.** Plaintiff asserts that the plane was out of service for six days. Defendant contends that the actual period of time was five and one-half days, and asserts that the half-day difference is significant in a commercial aviation context. This dispute of fact must be resolved at trial.

**2.** This fact reportedly is derived from an admission of plaintiff, *see* Ex. B to Wade Aff. of April 14, 1988, and is not disputed in any of plaintiff's motion papers.

**3.** These two questions, although closely linked, are not necessarily one and the same. If a substitute is rented to replace a damaged chattel, the rental fee represents the total pecuniary effect of loss of use *only* if the net operating profit (or loss) of the substitute is identical to that of the original. Were the substitute more (or less) profitable to operate than the original, the actual pecuniary damage attributable to loss of use of the original chattel would be smaller (or larger) than the rental fee.

## II.

In searching for law to apply to the instant motion, this Court must, of course, look to the law of New York State. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937). Unfortunately, the available precedents do not speak with a single voice.

*Mountain View Coach Lines, Inc. v. Hartnett*, 99 Misc.2d 271, 415 N.Y.S.2d 918 (Greene County Ct.1978), *aff'd without opinion*, 69 A.D.2d 1020, 414 N.Y.S.2d 947 *and aff'd mem.*, 70 A.D.2d 977 (3d Dept. 1979), *leave to app. denied*, 47 N.Y.2d 710, 393 N.E.2d 1050, 419 N.Y.S.2d 1026 (1979), appears to be the first reported case in which a New York appellate court considered whether a common carrier could recover damages, based on the rental cost of a replacement, for loss of use of a vehicle when in fact no substitute had been rented. In *Hartnett*, the defendant paid the cost of repairing plaintiff's bus before trial. Mountain View Coach conceded that it had extra buses even after using a reserve to replace the damaged bus, and that it had not rented a replacement. The court found that to award loss of use damages would have "paid for the use of a bus that would otherwise have stood idle." *Id.* at 272, 415 N.Y.S.2d 918. Reasoning that such a payment would represent a windfall to the plaintiff rather than compensation for a loss actually incurred, the court refused to award any damages for loss of use.

The trial court's opinion in *Hartnett* was published only after the Appellate Division, Third Department, affirmed on the opinion below. Thus, *Hartnett* was unavailable to the Second Circuit when *Koninklijke Luchtvaart Maatschaapij, N.V. (K.L.M. Royal Dutch Airlines) v. United Technologies Corp.*, 610 F.2d 1052 (2d Cir.1979) was decided. In *K.L.M.*, an aircraft leased by plaintiff was damaged when an engine exploded while the plane was on the ground. The airline sued the manufacturers and designers of the engine. The claim for repair costs was settled before trial, and the parties agreed to postpone trying the issue of liability until after determination, in a preliminary trial, of the quantum of damages recoverable for loss of use of the plane during the time required for repairs.

The preliminary trial was held before a magistrate whose report and recommendation was adopted without change by the district court. The report concluded, first, that K.L.M. could recover loss of use damages only for its "actual pecuniary loss," and second, that no such loss had been adequately proven. *Id.* at 1054.

The Second Circuit reversed. The Court of Appeals agreed that the airline had failed to prove pecuniary damages, but held that even without a showing of actual out-of-pocket loss, the airline could recover damages equal to the fair rental cost of a replacement plane.[4] Reasoning from a line of New York cases originally applied to negligently injured horses, the court noted that ownership of a chattel comprises a number of valuable rights, among them the right to use the chattel and the right to dispose of it for fair value. Both these rights are impaired when a tortfeasor damages a chattel, and each impairment is separately compensable. However, since neither of these rights can be valued directly, the law uses proxies to measure the value of the lost rights. The loss in value of the damaged thing itself is estimated by the expense of restoring the chattel to its pre-accident condition, *i.e.*, the cost of repairs. The value of the lost use of a thing for a period of time is similarly estimated by the expense of acquiring the use of that item for that time, *i.e.*, the rental cost of a replacement. Thus, repair costs and re-

---

**4.** The damaged plane, a relatively fuel-efficient DC–8, was out of commission during the OPEC oil embargo. Largely as a result of the unavailability of fuel, K.L.M. cancelled many flights that the DC–8 might have flown, rather than using a reserve plane. The magistrate's report noted that many of the cancelled flights might have lost money had they flown. K.L.M. attempted to prove that the DC–8, had it been available, would have been used on some routes instead of less efficient planes, thereby cutting down on K.L.M.'s operating costs. The evidence presented to support this theory was found insufficient by the magistrate and the district judge; the appellate court held that finding not clearly erroneous.

placement rental fees are included as items of damages, not to pay back actual out-of-pocket expenses, but to provide approximate compensation for lost rights. *Id.* at 1055–56.

From that viewpoint, the Second Circuit's conclusion that "[r]ental value may provide a measure of loss of use damages even though a substitute vehicle has not actually been hired," *id.*, followed immediately. As the Court pointed out, it would be ridiculous to demand proof of actual financial loss resulting from loss of use of a pleasure vehicle, yet the use of that vehicle nonetheless has value, which may be approximated by the rental cost of a replacement.[5]

The *K.L.M.* court considered and rejected the possibility that it was bound to affirm the district court because of *Brooklyn Eastern District Terminal v. United States,* 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932). *Brooklyn Terminal* was not controlling because it was decided under federal admiralty law rather than New York state tort law. However, the *K.L.M.* court also attempted to distinguish *Brooklyn Terminal* on its facts.

In *Brooklyn Terminal,* a tugboat was damaged in a collision. The trial court found both parties at fault and directed that damages, including repair costs and the rental cost of a replacement tug, be apportioned equally. The Second Circuit reversed the award of loss-of-use damages, and the Supreme Court affirmed the reversal.

The damaged tug in *Brooklyn Terminal* was owned by a company that towed barges carrying railroad cars from point to point in New York harbor. While the tug was being repaired, the company neither hired a rental boat nor pressed a reserve boat of its own into emergency service. Instead, the company was able to meet the demand for car-float towing by extending the hours of operation of its remaining, undamaged tugs.

Justice Cardozo, writing for a unanimous court, held that under those facts, it was error for the trial court to award damages based on the rental cost of a replacement boat. The opinion took pains to avoid foreclosing loss of use damages in all cases where no substitute was hired. Had the record contained proof of overtime wages paid to the crews of the undamaged tugs, or of extra wear and tear on the boats used overtime, then those costs would have been recoverable as loss of use damages, Justice Cardozo observed. Nor did *Brooklyn Terminal* rule out a measure of damages that had been used "in situations not dissimilar": The fair return on the investment represented by the tug, prorated to reflect the period of time the tug was out of service. The Court simply observed that nothing in the record below could establish the amount of damages so measured.

Moreover, *Brooklyn Terminal's* facts were specifically distinguished from cases in which fleet owners, who maintained and used standby boats to insure against disruptions of service, had been allowed to recover reasonable rental values even though they used their own spare boats, rather than rented ones, to replace damaged vessels. "If no such [spare] boat had been maintained," Justice Cardozo observed, "another might have been hired, and the hire charged as an expense." *Id.* at 177, 53 S.Ct. at 105. In a "business of such a nature that for the avoidance of loss there is need of the employment of a substitute ... the fair value of the hire may be an element of damage, ... whether the substitute is actually procured or not." *Id.* at 170, 53 S.Ct. at 103.

In *Brooklyn Terminal,* the towing company was able to avoid *both* financial loss *and* the employment of any substitute vessel, simply by having two boats do the

---

5. In effect, the Second Circuit reasoned that someone who loses use of a vehicle has a choice: either obtain the use of a comparable vehicle (and be paid for the expense of doing so) or accept the loss of use (and be compensated, equivalently, for that loss). Similarly, one whose car is dented might choose to repair the dent (and be paid for the cost of repair) or to accept owning a damaged and devalued auto (and be compensated, equivalently, for the consequent reduction in value of the car).

work of three.[6] The record in *K.L.M.* did not establish that the airline had been similarly fortunate, the Second Circuit held. 610 F.2d at 1057. Thus, the Court concluded, the defendants in *K.L.M.* could not avail themselves of *Brooklyn Terminal* even if the latter case had been applicable in a diversity setting.[7] The Court then reiterated that *Brooklyn Terminal* did not in fact apply, and that the law of New York, as then understood by the Second Circuit, permitted an owner or lessee of a commercial vehicle to "recover loss of use damages based on rental value without proving that he suffered actual financial loss and without proving that he needed a substitute vehicle to cover the loss of the damaged vehicle." *Id.* at 1057. Since the airline had leased, rather than owned, the damaged plane, the court observed, an appropriate measure of rental value—the fraction of the lease payments corresponding to the time the plane had been out of service—was readily at hand.

As noted above, the *K.L.M.* court acted in ignorance of the contrary decision of the Third Department in *Hartnett.* The *Hartnett* ruling was reaffirmed by the Third Department—without citing either *K.L.M.* or the line of authority on which *K.L.M.* had relied—in *Mountain View Coach Lines, Inc. v. Gehr,* 80 A.D.2d 949, 439 N.Y.S.2d 632 (3d Dept.1981) (Mem.), "a case factually identical" to *Hartnett.*

*Gehr* and *Hartnett* proved critical to the decision in *CTI International, Inc. v. Lloyds Underwriters,* 735 F.2d 679 (2d Cir. 1984). *CTI* involved a dispute over insurance coverage and subrogation rights that arose out of a maritime accident in which many cargo containers owned by the plaintiff had been destroyed, lost, or damaged. After a bench trial, the district court held that the plaintiff had failed to prove that the containers involved would have been rented had they been available, and thus no actual financial loss had been established. As in *K.L.M.*, the Second Circuit affirmed that finding as not clearly erroneous.

The appellate court then considered whether, on the strength of *K.L.M.*, the container company could recover the rental value of its containers as a measure of damages for the loss of their use. The court found it difficult to decide whether the facts of *CTI* were closer to *K.L.M.* or to *Brooklyn Terminal,* noting that "[t]he potential market for containers is not as fixed as the car-floats in *Brooklyn Terminal* though not as open-ended as the passenger traffic in *K.L.M.*" *Id.* at 684. The Court avoided that choice by relying on *Hartnett* and *Gehr,* which, the court stated, showed that New York law was not as had been "anticipated" by *K.L.M. Id.* Instead, *CTI* held, New York had adopted the *Brooklyn Terminal* approach as explained in *K.L.M.* (*see supra* note 7): loss of use damages might be awarded absent any evidence of the real pecuniary effects of putting a vehicle out of service, but not in the face of preponderant evidence tending to establish that no actual financial loss was incurred as a result of loss of use of the vehicle. Because the evidence in *CTI* had convinced the district court that the plaintiff in fact lost no rental income as a result of the damage to the cargo containers, no damages could be recovered for loss of use, the Court of Appeals concluded. *Id.*

*CTI* might have ended the debate, but as it turned out, the *CTI* panel was no better

---

**6.** As noted above, the tug owner could have recovered the costs incurred by this strategy, had any been proven.

**7.** The *K.L.M.* court unfortunately focussed on the "static number" of car-floats for the towing fleet in *Brooklyn Terminal* as compared to the "far greater and more cyclical" number of potential passengers for airline flights. The opinion does not disclose the source of the court's views on the short-run elasticity of demand for car-floats. As defendant's brief to this Court points out, *K.L.M.'s* construction of *Brooklyn Terminal* is best understood as follows: *Brook-*

*lyn Terminal* holds that the owner of a damaged vessel may recover loss of use damages without showing proof of actual replacement expense, *unless* defendant can establish that the plaintiff did not have to choose between lost profits and replacement costs; if the defendant meets this burden, plaintiff's loss of use damages are limited to actual financial injury proven. The pitfalls of *K.L.M.'s* attempt to distinguish *Brooklyn Terminal* were revealed in *CTI International, Inc. v. Lloyd's Underwriters,* 735 F.2d 679 (2d Cir.1984), which is discussed *infra.*

than the *K.L.M.* panel at predicting the vicissitudes of New York courts. Less than a month after *CTI* was decided, a different department of the Appellate Division of the New York State Supreme Court rewarded the persistence of the bus company that the Third Department had twice rebuffed. In *Mountain View Coach Lines, Inc. v. Storms,* 102 A.D.2d 663, 476 N.Y.S.2d 918 (2d Dept.1984), the court, per Justice Titone (now a Judge of the New York Court of Appeals), criticized *Gehr* and *Hartnett* as "a 'conclusory assertion of result,' in conflict with settled principles," and refused to follow them. 476 N.Y.S.2d at 920 (quoting *People v. Hobson,* 39 N.Y.2d 479, 490, 384 N.Y.S.2d 419, 426, 348 N.E.2d 894 (1976)).[8]

The facts in *Storms* were the same as in *Hartnett* and *Gehr:* the defendant negligently damaged one of plaintiff's buses, and during the period of repair the "plaintiff did not hire a substitute bus, utilizing one it maintained in reserve instead." 476 N.Y.S.2d at 919. The parties stipulated that "the damages sustained for loss of use"—presumably the rental cost of a replacement bus[9]—"were $3,200," *id.,* but the defendant persuaded the trial court that plaintiff's failure actually to rent a bus precluded recovery of those damages. The Second Department reversed, ironically relying on *Brooklyn Terminal. Storms,* Justice Titone wrote, was indistinguishable from the "spare boat" case analyzed but held inapposite in *Brooklyn Terminal.*[10] The court directed entry of judgment in plaintiff's favor for the stipulated rental cost of the replacement bus, even though the replacement actually used came from plaintiff's reserve fleet. *Storms,* for the moment, is the last reported word on the question from the New York State courts.[11]

### III.

Given this state of authority, the positions taken by the parties in the case at bar are unsurprising. Plaintiff contends that *Storms* and *K.L.M.* correctly state New York law, and that it may therefore recover, as a matter of law, "the reasonable rental value of a substitute aircraft," even if plaintiff submits no proof of actual pecuniary loss, or indeed even in the face of evidence tending to negate the proposition that plaintiff suffered actual pecuniary loss. Defendant, predictably, counters that plaintiff is not entitled to summary judgment of entitlement to loss of use damages, because defendant has offered proof that at least raises a material issue of fact as to whether the collision caused plaintiff any loss of profits. Defendant argues that its showing either entirely precludes loss of use damages, or, at least, shifts the burden to the plaintiff to prove actual, rather than presumed, financial damages arising from the loss of use of the 747. Defendant relies on *CTI, Hartnett* and *Gehr* as accurate statements of New York law.[12]

■ Sitting in diversity and bound to apply New York law, this Court must choose—in the absence of an applicable decision of the New York Court of Appeals—between directly conflicting doctrines followed by different Departments of this

---

8. The Second Department, in a footnote, rejected *CTI* as well, because of *CTI's* reliance on *Gehr* and *Hartnett.*

9. There can be no doubt that the parties in *Storms* stipulated only to the amount a rented bus would have cost, and did not agree that $3,200 of out-of-pocket damages were actually sustained as a result of the loss of use of the bus. Had the latter been the case, as is implied in defendant's brief to this Court, there would have been no issue for the court to resolve in *Storms.*

10. *Storms* implicitly critized *Brooklyn Terminal's* holding that the "spare boat doctrine" did not apply to vessels "acquired and maintained for the general uses of the business," as opposed to one used strictly as a spare for contingencies.

However, because there was no question in *Storms* that the bus company met its needs by using an extra bus, not by using its regular fleet more intensively, the spare boat doctrine applied rather than the actual holding of *Brooklyn Terminal.* 476 N.Y.S.2d at 921 n. 1.

11. The Second Circuit, of course, continues to apply *Brooklyn Terminal* in admiralty cases. *See, e.g., Prudential Lines, Inc. v. McAllister Bros., Inc.,* 801 F.2d 616, 622 (2d Cir.1986).

12. Defendant attempts to distinguish *Storms* based on that opinion's statement that "the parties stipulated ... that the damages sustained for loss of use were $3,000," whereas in this case, defendant denies that *any* loss of use damages were in fact sustained. As explained in footnote 9, *supra,* this distinction is illusory.

State's intermediate appellate court. Despite the difficulties inherent in such a task, this Court "cannot throw up [its] hands and walk away from the problem." *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 849 (2d Cir.1984) (affirming district court's application of rules derived from "New York's choice-of-law quagmire," *id.* at 847). Notwithstanding this Court's duty to make a choice, however, the Court's research has disclosed no Second Circuit case providing explicit methodological guidance for diversity courts confronted with conflicts among Departments of the Appellate Division.[13]

The general rule is that "[w]here the law of the state is unclear or non-existent as to the matter in controversy ... the court must determine what result the state court would reach if the case had been brought in state court." *Brastex Corp. v. Allen Intern., Inc.*, 702 F.2d 326, 330 (2d Cir. 1983). In *Brastex*, where there was no New York law on the question at issue, the court simply analyzed the issue on its own, assuming that a New York court would likewise reach the same well-reasoned result. *See also In re Leasing Consultants Inc.*, 592 F.2d 103, 109 (2d Cir.1979). Applying the general rule in a case where two New York Supreme Court decisions had "reflect[ed] two irreconcilable approaches to the same problem," Judge Gagliardi considered the two cases and applied the one he found to "represent[ ] the sounder approach." *United Technologies Corp. v. Citibank, N.A.*, 469 F.Supp. 473, 480 (S.D. N.Y.1979). As a practical matter, this Court must take the same course in predicting how the New York Court of Appeals would resolve the conflict between the Second and Third Departments.[14]

## IV.

This Court is convinced that the New York Court of Appeals, were it called

---

**13.** Even accord among the Second and Third Departments would not necessarily dictate this Court's decision. "[T]he decision of an intermediate state court on a question of state law is binding on [a diversity court] unless we find persuasive evidence that the highest state court would reach a different conclusion." *Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 132 (2d Cir.1984). In *Entron*, the Second Circuit relied on an obliquely applicable decision of the New Jersey Supreme Court, and disregarded an on-point ruling of the Appellate Division of the New Jersey Superior Court. In *Harem–Christensen Corp. v. M.S. Frigo Harmony*, 477 F.Supp. 694 (S.D.N.Y.1979), the District Court followed the dissenting rather than the majority opinion in *Fantis Foods, Inc. v. Standard Importing Co.*, 63 A.D.2d 52, 406 N.Y.S.2d 763 (1st Dept.1978). Judge Knapp, observing that rulings of lower state courts are entitled only to "proper regard" from federal courts sitting in diversity, rejected the *Fantis Foods* holding because it was "wholly unpersuasive." 477 F.Supp. at 697. These cases are examples of the general rule that, while the pronouncements of a state's highest court unequivocally constitute that state's law, decisions of lower state courts must be examined to determine whether "it is reasonable to assume that [they] present the current status of state law." *Spokane Arcades, Inc. v. Eikenberry*, 544 F.Supp. 1034, 1047 n. 7 (E.D.Wash.1982).

**14.** Judge Shadur of the District Court for the Northern District of Illinois has taken a different and apparently unique approach to the problem of conflicting decisions of intermediate state courts of appeals. Illinois law requires each trial judge to follow decisions issued by the Appellate District in which the trial judge sits. Judge Shadur reasons that because this rule is a part of Illinois substantive law, which a federal court sitting in diversity must apply, he is bound by the rule just as a state trial court would be. Therefore, rather than attempting to predict how the Illinois Supreme Court would resolve disputes among its Appellate Districts, Judge Shadur applies the rule announced by the Appellate District in which venue would have been proper had the case been brought in state court. *See, e.g., Rizzo v. Means Servs. Inc.*, 632 F.Supp. 1115, 1131–33 (N.D. Ill.1986). Judge Shadur's analysis has not been followed by his colleagues. *See, e.g., Kelly v. Stratton*, 552 F.Supp. 641 (N.D.Ill.1982) (Marshall, J.) (declining to follow an earlier version of Judge Shadur's method).

New York's rules of *stare decisis* are similar to those of Illinois. *See Storms*, 476 N.Y.S.2d at 919–20 (absent decision by Court of Appeals, trial court is bound by decision of Appellate Division in its own Department although decision of another Department must be followed if trial court's own Department has not ruled). This Court is of course bound to follow the Second Circuit's approach (dubbed the "Supreme–Court–prediction" method by Judge Shadur). However, the Court does note some merit to Judge Shadur's position, and also notes that were his "Appellate–Court–adherence" method applied in this case, it would dictate that this Court follow the Second Department's *Storms* decision—the result reached in Section IV, *infra*.

upon to decide the issue, would adopt the *KLM–Storms* approach and reject *Gehr–Hartnett–CTI.* The approach of *Storms* and *KLM* represents sounder reasoning than the contrary decisions and are more consistent with settled principles of tort doctrine and, as discussed in *KLM,* with earlier, somewhat analogous cases.[15]

■ As Judge Gurfein observed in *KLM,* loss of use damages exist to compensate for the deprivation of the owner's right to use its chattel as the owner sees fit. This right has a value, and its deprivation necessarily entails what economists call "opportunity cost." *Any* particular allocation of a resource necessarily costs the owner the opportunity to put that resource to other, competing uses. When a tortfeasor by its negligence forces a thing's owner to allocate that chattel to the singularly unsatisfying use of sitting in a repair shop for a while, that tortfeasor forecloses the owner's opportunity to put the chattel to some productive use.

The opportunity cost exists irrespective of the normal use to which the owner allocates the damaged item. For example, in the case of a vehicle that is used only for pleasure—say, a privately owned, high-powered sports car—the loss of the car's use deprives the owner of the opportunity to drive the car for pleasure during the repair period. Again invoking the economist's language, one could say that the owner has lost "utility." The value of that utility is measurable by the amount the owner is willing or required to spend to obtain it. There is no controversy, as a

matter of tort doctrine, that the sports car owner so deprived is entitled to replace the lost utility directly, by renting an equivalent automobile and recovering the rental cost from the tortfeasor. No sound reason exists for denying that same recovery for the value of lost utility even if the owner does not rent a substitute car.

The result is no different in the case of a driver who owns a second, identical sports car that is kept in reserve for just such contingencies. The reserve sports car might enable the owner to do the same amount of pleasure driving after the tort as before, but the tort still carries with it an opportunity cost. The owner has lost the opportunity to lend the second sports car to a friend, or to keep one car brand-new while using the other, or simply to drive home in one car while smugly knowing that there is another in the garage. This lost opportunity also has a compensable value.

Shifting from a pleasure vehicle, maintained only to enhance its owner's utility, to a commercial vehicle that is maintained to provide a return on investment, has no effect whatever on the analysis.[16] To an airline, ownership of a 747 represents a bundle of valuable opportunities. Those opportunities range from the chance to use the plane to entertain the board of directors and important shareholders, through flying the plane on regularly-scheduled routes, through leasing it to another airline, through holding it in reserve for use as a replacement in case another aircraft must be taken out of service.

---

**15.** Although soundness of the announced doctrine is the principal reason this Court predicts that New York's highest court would follow *Storms,* there are other, minor indicia that lead this Court—"in effect, sitting as a state court," *C.I.R. v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967)—to adopt the *Storms* rationale. The Third Department decided *Hartnett* without opinion, adopting instead a four-paragraph opinion issued and not even previously published by the trial judge. *Gehr* was decided in a one-paragraph memorandum. Except for *Gehr's* reference to *Hartnett,* neither of the Third Department cases cited any cases as authority. By contrast, *Storms* occupies nearly three pages of the *New York Supplement,* reviews prior case law extensively, and generally reflects a more thorough analysis of

the issue. This Court also attaches some predictive significance to the fact that *Storms'* author, then-Justice Titone, now sits on the Court of Appeals—the very court the behavior of which this Court is bound to predict.

**16.** The sharp distinction between pleasure and profit-making vehicles is somewhat artificial. A classic sports car may be a valuable investment as well as being fun to drive. And the decision to use the car only for pleasure in fact represents a resource allocation that carries its own opportunity cost. By giving up some hours of pleasure driving, and therefore some utility, the owner might be able to make money renting the car for hour-long joyrides.

Those opportunities are all temporarily lost when a tortfeasor renders the aircraft unserviceable for a period of time. That opportunity cost *cannot* be valueless; it *must* be worth something. The difficulty sometimes encountered, of course, is choosing the appropriate method by which to measure that value.

In some cases, the best way to approximate that value will be perfectly obvious. If a replacement plane were actually rented, the rental fee would be an appropriate choice. Or if, as was the case in *KLM*, the damaged plane were itself leased rather than owned by the victim of the tort, the prorated portion of the lease payments would approximate the value of the use of the plane for the time during which it was out of service. *See KLM*, 610 F.2d at 1055–57.

The foregoing examples are the easy ones, because the proxy used to measure the airline's opportunity cost is in each case an actual out-of-pocket sum spent by the airline. Almost as easy is the case in which an airline, having no substitute plane available and choosing not to rent one, cancels the damaged airliner's flights. In such a case, the ready measure of the airline's loss would be the lost revenue from the cancelled flights, less operating costs saved by not flying.[17]

Suppose, however, that an airline with no spare planes did not cancel any flights but instead met its schedules by stretching its regular fleet (minus the damaged plane) just enough to cover its needs. This is the *Brooklyn Terminal* case, and here the actual measure of damages is still more difficult to prove. Yet even in this case, the damages still exist. As Justice Cardozo pointed out, had the tugboat operator in *Brooklyn Terminal* been able to document

overtime wages or "extra wear and tear" on the undamaged tugs, those damages would have been recoverable.[18] 287 U.S. at 173, 53 S.Ct. at 104.

Finally, consider the case in which an airline maintains one or more airplanes that are normally held in reserve. When a front-line plane is damaged, the airline presses the reserves into service. As Justice Cardozo observed, that "result is all one" whether the replacement plane is rented from a lessor or moved from reserve status into active duty. 287 U.S. at 177, 53 S.Ct. at 105. The "spare boat doctrine" reasoning was adopted by *Storms*, 476 N.Y.S.2d at 920–21.

■ The concept of opportunity cost makes it easy to see how the airline using a spare plane suffers a genuine loss even though it does not spend money to rent an aircraft. Any prudent airline that is obligated to fly, say, 100 planes to meet its daily schedule, will own more than 100 airliners in recognition of the actuarial inevitability that some planes will be out of service on some days. The airline might determine, for example, that to be reasonably secure from the risk of flight cancellation, it would need to own 110 planes to cover a 100–plane daily need. The need for a 10–plane reserve arises from several sources: lost service days for regular inspection and maintenance, unforseen breakdowns, accidents caused by the airline's own carelessness—*and* accidents caused by the negligence of others. If an airline could be certain that its planes would never be damaged by the fault of tortfeasors, it would be able to get by with a smaller reserve fleet. As a practical matter, it is probably impossible to know whether one, two, or more of the spare

17. In determining lost revenue and saved costs, the appropriate measure of damages would assume the most efficient use of the airline's fleet that is reasonably supported by the evidence. *Cf. KLM*, 610 F.2d at 1057–59 (rejecting as unproven the argument that KLM would have saved money by reallocating its planes had the accident not occurred).

18. *Brooklyn Terminal* is essentially a prudential decision that, where the rest of the fleet in regular service can pick up the slack for a

damaged vehicle, using rental value of a replacement unreasonably exceeds the "wide range of judgment ... conceded to the triers of the facts" in choosing a measure of damages. 287 U.S. at 176, 53 S.Ct. at 105. In light of *Storms*, this Court is unconvinced that New York's rule would similarly restrain the factfinder's discretion. *See Storms*, 476 N.Y.S.2d at 921 n. 1 (noting criticism of the *Brooklyn Terminal* holding).

planes must be maintained solely as insurance against negligence of others. But it is possible, after a particular accident has occurred, and the airline has utilized a particular spare airplane, to estimate the lifetime cost of owning and maintaining that spare airplane. It is also possible to calculate the percentage of the spare plane's lifetime represented by the number of days the accident causes the airline to use the spare plane. That percentage, multiplied by the lifetime cost of the plane, represents the fraction of the airline's reserve fleet costs that are directly attributable to a particular tortfeasor, and approximates the economic injury to the airline that results from loss of use of the damaged front-line plane.[19]

■ Tort doctrine requires full compensation for tortiously-inflicted damage. The position taken by defendant in this lawsuit would restrict parties in the position of the plaintiff in this case (and in *Gehr, Harnett,* and *Storms*) to recovery of out-of-pocket payments made to replace a damaged vehicle, or to profits lost as a result of trip cancellations. As the discussion *supra* reveals, however, a real economic loss may be incurred, and approximately measured, even in the absence of apparent pecuniary losses. Thus the doctrine of *Storms* is sound, and this Court predicts that the New York Court of Appeals, were it to decide the question, would hold that damages for loss of use of a vehicle may be recovered even absent a showing that profitable vehicle trips were cancelled or that a substitute vehicle was rented.

### V.

The story, however, cannot quite end there, because the conclusion just reached does not imply that the plaintiff is entitled to the partial summary judgment. Quite the contrary is the case.

■ The Court agrees with plaintiff that loss of use damages *may* be proven and recovered even though no substitute plane was actually rented. The plaintiff asks for more, however, than a determination that it is entitled to recover loss of use damages. Plaintiff also seeks a ruling "that these damages are to be measured by the reasonable rental value of a substitute aircraft." To this second requested ruling plaintiff is not entitled.

In *Storms,* the Appellate Division directed entry of judgment in the plaintiff's favor for $3,200, the stipulated rental value of a replacement for the damaged bus. Because the parties had stipulated how the loss of use damages were to be measured if recovery for loss of use were allowed, the *Storms* court had no need to consider the method of measuring damages; the Court had only to determine that the plaintiff's failure to rent a substitute bus did not bar recovery of the stipulated damages.

The present case is quite different. It is undisputed that there is no market for rental of Boeing 747's to commercial passenger airlines for six-day periods. The "reasonable rental cost" urged by plaintiff as a measure of damages is apparently the output of an economic model devised by plaintiff or by plaintiff's retained expert. The evidence presented by defendant on this motion is sufficient to raise a material issue of fact as to the reliability and suitability of plaintiff's analysis. Wade Aff., Ex.B. Defendant is entitled to attempt to prove at trial that the "reasonable rental cost" proferred by plaintiff is nothing more than speculation and as such insufficient to support a recovery. *See Brooklyn Terminal,* 287 U.S. at 175, 53 S.Ct. at 104.

Given the dispute as to whether plaintiff's calculations of rental cost are "reasonable," a summary judgment declaring that "reasonable rental cost" is recoverable would have no practical effect whatsoever

---

**19.** There might be other costs as well—for example, the incremental depreciation of the spare plane that results from its being flown instead of standing idle, or profits lost from a charter that had to be foregone because the spare plane was needed to fly scheduled routes—but they are not of analytical importance. The point is not to show that prorated lifetime cost of the spare is an exclusive measure of loss of use damages in a case such as this, but rather to demonstrate that such damages exist even absent out-of-pocket expense. For the same reason, this section does not consider the possible offsetting economic benefits to the airline that are discussed in Section V, *infra.*

on this litigation. To grant such a judgment would be inappropriate for another reason as well. Defendant, having challenged plaintiff's method of estimating loss of use damages, is entitled to the opportunity to suggest, at trial, that an alternative method should be chosen. Thus while it is appropriate at this time for the Court to determine that plaintiff may recover a reasonable measure of loss of use damages, it would be premature for the Court to hold that any particular measure of damages is the one to be applied.[20]

Finally, defendant in this case has also raised a material issue of fact as to the effect that using the Airbus had on the profitability of the route the Airbus flew in the damaged 747's stead. Wade Aff. Ex.B. Defendant is wrong when it argues that if the Airbus' lower operating costs resulted in higher profits, plaintiff *necessarily* suffered no loss of use damages. However, under settled principles of tort law in New York and elsewhere, increased operating profits could partially or entirely offset the damages for loss of use (no matter how loss of use damages are calculated).[21] "Damages are to restore injured parties, not to reward them." *Hartnett*, 415 N.Y. S.2d at 918. Even if this Court agreed with plaintiff that "reasonable replacement rental value" represented the appropriate gross measure of loss of use damages, the Court could not grant the requested summary judgment in the face of a material issue of fact directly affecting the net amount of such recovery. Plaintiff is entitled to a reasonable measure of loss of use damages even absent any out-of-pocket expenditures, but those damages must be reduced to the extent, if any, that they were recouped by operating efficiencies that are proven to have resulted from the accident.[22]

## CONCLUSION

For the reasons stated above, plaintiff's motion for partial summary judgment is

20. Reasonable replacement rental cost might turn out to be the best available estimation, but other approximations are possible. The prorated lifetime cost of the spare plane, as discussed *supra* Section IV, is a conceivable alternative measure, and there are doubtless others.

21. This conclusion is not inconsistent with the analysis at the end of Section IV, *supra*. Section IV implicitly assumed that all the planes in the airline's primary and reserve fleets were absolutely interchangeable. In the real world, fungibility would be the exception rather than the rule. For instance, one might normally expect a reserve fleet to be populated with older, relatively inefficient aircraft. The extra fuel costs resulting from use of the older plane would then be *added* to the loss of use damages as measured by rental value or other method. Similarly, because an Airbus is smaller than a 747, in times of peak demand the use of an Airbus would likely reduce flight revenues and hence profits. The lost profits would be added to the loss of use damages. These additions make perfect sense: had the airline actually needed to rent a replacement plane, that turned out to be less profitable to fly, the damages would clearly include both the rental fee and the lost profits. So with the use of a spare plane. But with the good plaintiff must take the bad: if the replacement plane turns out to be more profitable to use than the damaged plane, the increased profits must be subtracted from the recovery. *See supra* note 4.

22. In *KLM,* the Second Circuit noted that "saved operating costs and depreciation are normally deducted from rental value to arrive at damages for loss of use of an automobile" in cases where no replacement car was actually rented. 610 F.2d at 1056. The theory behind this rule is quite simple: the owner who chooses to do without the car for a time does lose all the benefits of driving it, but he also avoids the costs of filling it with gasoline, wearing down the tire tread, etc.; it is only fair that these foregone costs be deducted from the recovery. The rule of "automatically" offsetting saved operating costs should not be applied to commercial aircraft because "there is always the possibility that any operating costs and depreciation saved by loss of use of the vehicle would have been offset by revenues generated if the vehicle had been available...." Id.

KLM's reasoning is sound but in this respect its facts are distinguishable from those of the case at bar. In KLM there was no replacement plane. The plane that was out of service neither cost the airline money to operate nor generated any ticket revenues for the airline. Any prediction by the Court of the net effect of lost revenues and saved expenses would have been guesswork, which the court quite properly refused to indulge. In the case before this Court, by contrast, a reserve plane was used, and the defendant has offered to prove that use of the reserve plane reduced operating costs while having no effect on revenues. If defendant can establish those facts, the recovery must be reduced by the proven amount of increased profits.

denied. At trial, the recoverable damages for loss of use of plaintiff's 747, if any, shall be determined in accordance with the principles set forth in Sections IV and V, *supra.*

SO ORDERED.