**SYBRON TRANSITION CORPORATION,**
Plaintiff,

v.

**NIXON, HARGRAVE, DEVANS & DOYLE, Defendant.**

**No. CIV–90–944S.**

United States District Court, W.D. New York.

July 17, 1991.

H. Kenneth Schroeder, Jr., Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y., for plaintiff.

Philip H. Magner, Jr., Magner, Love & Morris, P.C., Buffalo, N.Y., for defendant.

## DECISION AND ORDER

SKRETNY, District Judge.

Defendant Nixon, Hargrave, Devans & Doyle ("Nixon Hargrave") brings this motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted. In support of its motion, Nixon Hargrave submits the affidavits of defendant's counsel Phillip H. Magner, Jr., Esq., sworn to on December 12, 1990, February 11, 1991 and March 11, 1991, a memorandum of law ("Nixon Hargrave memo"), a reply memorandum of law ("Nixon Hargrave reply"), and a letter brief to the Court dated March 11, 1991 ("letter brief").

In opposition to the motion, plaintiff Sybron Transition Corporation ("Sybron") submits the affidavit of plaintiff's counsel H. Kenneth Schroeder, Jr., Esq., sworn to on January 25, 1991, a memorandum of law ("Sybron memo") and a reply memorandum of law ("Sybron reply").[1]

I also heard oral argument on February 21, 1991.

For the reasons set forth herein, Nixon Hargrave's motion is denied. Notwithstanding this denial, Sybron's claim is narrowed and limited as articulated below.

## BACKGROUND

Sybron, a Delaware Corporation with its principal place of business in Wisconsin, brings this malpractice action against its former attorneys, Nixon Hargrave. Jurisdiction is predicated on diversity.

---

**1.** Sybron also submits the affidavit of Donald F. Frei, sworn to on January 25, 1991 and the affidavit of Howard E. Jackson, sworn to on January 28, 1991. Messrs. Frei and Jackson are purported experts and their affidavits render opinions as to the validity of U.S. Patent No. 3,914,055. However, the validity or invalidity of the patent is a question of fact which is irrelevant to this motion. Therefore, I have not considered these affidavits.

*The Lansing Litigation*

This litigation stems from an action that was commenced in 1986 in New York State Supreme Court by Lansing Research Corporation ("Lansing") against Sybron's predecessor. In the prior litigation (the "Lansing litigation"), Lansing alleged that it had entered into an agreement with Sybron (the "agreement") under which Lansing granted to Sybron an "exclusive license" to make, use and sell a certain device called an optical core processor ("OCP"), on which Lansing held U.S. Patent No. 3,914,055 (the "'055 patent") (See Exhibit A).[2] In return, Sybron allegedly agreed to pay minimum royalty payments. Lansing commenced the Lansing litigation to recover royalty payments under the agreement and, in a separate cause of action, to recover "the reasonable value of the exclusive license," a total of $3,538,539.11.

Sybron hired Nixon Hargrave to defend against the Lansing litigation. Nixon Hargrave filed an answer on behalf of Sybron which asserted seven affirmative defenses, including the SIXTH and SEVENTH affirmative defenses, which alleged that the '055 patent was invalid.

After some discovery in the Lansing litigation, Sybron moved for summary judgment. Apparently without addressing any of the seven affirmative defenses it initially asserted, Nixon Hargrave argued on behalf of Sybron only that the terms of the agreement did not require Sybron to make any payments to Lansing, and in the event that Sybron did not make minimum royalty payments, Lansing's sole remedy under the agreement was to accept Sybron's reconveyance of the exclusive license. (See Exhibit C). Lansing cross-moved for summary judgment. (See Exhibit D).

Hon. Frederick B. Bryant, J.S.C., granted Lansing's cross-motion, ruling that Lansing was not obligated under the agreement to accept a reconveyance and that Sybron was obligated to make minimum royalty payments to Lansing. (See Exhibit E, at 6). Moreover, Justice Bryant ruled that Sybron failed to establish its affirmative defenses (Exhibit E, at 11), entered final judgment in favor of Lansing, and directed Sybron to pay damages to Lansing as demanded in Lansing's complaint ("first decision") (Exhibit E, at 13).[3]

Faced with this adverse decision, Nixon Hargrave moved on behalf of Sybron for leave to renew the summary judgment motion, or in the alternative, to vacate the judgment (the "renewal motion") (See Exhibit F). In support of the renewal motion, Nixon Hargrave submitted the affidavits of two of its attorneys, explaining to the Court that Nixon Hargrave approached the motions as limited to the contract interpretation issue.[4] Therefore, Nixon Hargrave did not think it necessary to address the affirmative defenses. Additionally, Nixon Hargrave claimed that at the time it moved for summary judgment, it had not conducted sufficient discovery to address the affirmative defenses. Interestingly, however, Nixon Hargrave was able to submit detailed affidavits which addressed the affirmative defenses on the merits. Justice Bryant denied the renewal motion ("second decision") (See Exhibit G) and the Appellate Division, Third Department, affirmed both the first decision and the second decision (See Exhibit H).

*The Present Action*

In this action, Sybron asserts a single cause of action against Nixon Hargrave, alleging that Nixon Hargrave negligently handled the Lansing litigation because (1) it did not properly designate Sybron's original motion for summary judgment as one

---

2. Unless otherwise noted, references to Exhibits are to those lettered exhibits attached to and incorporated by reference into Sybron's complaint herein.

3. Justice Bryant also dismissed Lansing's second cause of action. Therefore, the award was for royalties only, and not for "the reasonable value of the exclusive license."

4. William D. Eggers, a member of Nixon Hargrave, expressed "surprise that Sybron's affirmative defenses of misrepresentation, fraud and patent invalidity had been reached by the Court's decision." (Exhibit F).

for *partial* summary judgment addressed solely to the issue of contract interpretation, (Complaint, ¶ 11); and (2) in responding to Lansing's cross-motion for summary judgment, it failed "to fully and completely respond to said cross-motion by asserting ... all of the other affirmative defenses previously asserted by Sybron in its Answer." (Complaint, ¶¶ 15–16). More specifically, Sybron alleges that had Nixon Hargrave properly asserted and preserved the SIXTH and SEVENTH affirmative defenses alleging the invalidity of the '055 patent, judgment would have been entered for Sybron as a matter of law. (Complaint, ¶¶ 33–34).

Sybron alleges that it has paid $2,043,667.84 in damages to Lansing and will be required to make further payments to Lansing of approximately $460,000.00, all of which Sybron seeks to recover in this action. (Complaint, ¶ 31). Sybron also seeks to recover $142,229.54 it paid to Nixon Hargrave in fees and disbursements. (Complaint, ¶ 32).

*The Instant Motion to Dismiss*

Nixon Hargrave expressly limits its motion to dismiss to the issue of proximate cause. As an element of Sybron's prima facie case for legal malpractice, Sybron must show that but for Nixon Hargrave's negligence, Sybron would have succeeded in the Lansing litigation. *Romanian American Interests, Inc. v. Scher*, 94 A.D.2d 549, 464 N.Y.S.2d 821, 822 (2d Dep't 1983). Nixon Hargrave argues that as a matter of law, Sybron cannot make this showing. Focusing on Sybron's allegation that Nixon Hargrave's negligence prevented Sybron from prevailing on the SIXTH and SEVENTH affirmative defenses, Nixon Hargrave argues that, irrespective of any alleged negligence it may have committed, those defenses were legally doomed for two reasons. First, Sybron would have been estopped from asserting patent invalidity in the Lansing litigation by the "legal doctrine of assignee estoppel." Second, even if Sybron were permitted to attack the validity of the '055 patent and was able to do so successfully, Sybron would still have been bound to pay royalties under the

agreement because the agreement to pay royalties was supported by valuable consideration other than the '055 patent.

"Assignee estoppel," as espoused by Nixon Hargrave, "prevents an assignee from representing the validity of and defending a patent to the world, and then asserting its worthlessness to its assignor when it is asked to pay for the rights it has purchased and used." (Nixon Hargrave memo, at 12). Nixon Hargrave argues that this doctrine would have estopped Sybron from asserting in the Lansing litigation that the '055 patent was invalid, for such an assertion would have enabled Sybron to avoid its obligation to pay Lansing the agreed upon consideration for the '055 patent. Thus, "the defense of patent invalidity ... would not have been available to Sybron no matter what Nixon Hargrave did on Sybron's behalf," (Nixon Hargrave memo, at 15), and Nixon Hargrave's alleged negligence, even if proven, could not have caused damage to Sybron.

Sybron responds that "assignee estoppel" should not apply to this case because Sybron is a licensee, not an assignee. "Assignor/assignee estoppel is applicable only when there has been a *complete assignment* of all rights, including title, to the patent involved...." (Sybron memo, at 4–5) (emphasis in original). Sybron argues that the agreement merely contemplated a conveyance to Sybron of an exclusive license in the '055 patent, which is something less than a complete assignment. Therefore, under *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) (discussed *infra*), Sybron argues that it was free as a licensee to attack the validity of the '055 patent, and, but for Nixon Hargrave's negligence, would have done so successfully and prevailed in the Lansing litigation. Alternatively, Sybron argues that Nixon Hargrave lacks standing to assert assignee estoppel and that Lansing waived assignee estoppel in the Lansing litigation.

Nixon Hargrave's second argument is that under the agreement, Sybron received consideration which consisted of not only the '055 patent, but a whole "bundle of

rights," including the OCP prototype, improvement patents, foreign patents and a head start in the marketplace. (Nixon Hargrave memo, at 10). Thus, the '055 patent was not so central to the bargain that its invalidity would result in a total failure of consideration. Therefore, even if the '055 patent were invalid, the agreement would still have been supported by sufficient consideration and Sybron would nonetheless have been obliged to make royalty payments to Lansing.

In response, Sybron argues that the '055 patent was the "material and crucial element of the contract" (Sybron reply, at 14), without which the agreement lacks consideration and is unenforceable. The foreign and improvement patents could not have constituted any part of the consideration because they were not ascertainable at the time the parties entered into the agreement. (Sybron reply, at 16). Therefore, had Nixon Hargrave performed competently, the '055 patent would have been adjudged invalid, the agreement would have been rendered unenforceable because of a total failure of consideration and Sybron would have prevailed in the Lansing litigation.

## DISCUSSION

### Motion to Dismiss Standard

Nixon Hargrave cannot prevail on this motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In applying this standard, the allegations of the complaint must be accepted as true. *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 411, 106 S.Ct. 1922, 1924, 90 L.Ed.2d 413 (1986). Simply stated, this requires me to assume that all the facts plaintiff asserts in the complaint are true and to decide, given those facts, whether it is legally possible for plaintiff to recover. Thus, Nixon Hargrave's comments regarding the difficulty Sybron may ultimately have in meeting its burden of proof (Nixon Hargrave memo, at 6–8) have absolutely no relevance to the instant motion. Sybron need not produce any evidence at this time to prove the allegations in the complaint and it would be entirely inappropriate for me to appraise at this time the quantity or quality of evidence Sybron may be required to produce in the future. *See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (function of a motion to dismiss is to "assess the legal feasibility of the complaint," and "the district court should not be swayed into granting the motion because the possibility of ultimate recovery is remote.")

## I. ASSIGNEE ESTOPPEL

### The Agreement

My first task with regard to assignee estoppel is to determine whether, as a matter of law, the agreement between Sybron and Lansing created a license or an assignment. The parties agree, and under *Lear, Inc. v. Adkins, supra,* the law is clear, that if the agreement created a license, Sybron as licensee would have been free to assert patent invalidity in the Lansing litigation. If that is the case, Nixon Hargrave cannot prevail on its assignee estoppel argument.

In *Lear,* the Supreme Court permitted the licensee of a patent to attack the patent's validity and avoid paying contractual royalties to the owner of the invalid patent, thereby abolishing the doctrine of licensee estoppel. The Court balanced the licensor's interest in enforcing its contract with the licensee against the public's interest in "permitting full and free competition in the use of ideas which are in reality part of the public domain." 395 U.S. at 670, 89 S.Ct. at 1911. The Court concluded that the equities of the licensor "do not weigh very heavily ..." and "the technical requirements of contract doctrine must give way before the demands of the public interest." *Id.* The licensee was thus permitted to challenge the patent's validity.

After examining all the parties' arguments as to whether the agreement entered into between Lansing and Sybron created a license or an assignment, I conclude

that it created an assignment, whereby Sybron became the owner of the '055 patent.

■ The agreement unequivocally contemplates that "LANSING will sell and transfer to SYBRON, and SYBRON will purchase, and accept, an *exclusive worldwide right* and license to practice Licensed Methods and *to make, have made, use and sell* Licensed Instruments, for the duration of this Agreement." (Appendix to Nixon Hargrave's motion, at Exhibit H, Tab 28 ("Agreement"), Part II, ¶ 2) (emphasis added).[5] An agreement which grants "the exclusive right to make, use, and vend the invention" is an assignment, not a license. *Waterman v. MacKenzie,* 138 U.S. 252, 255–56, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891). *See also Kenyon v. Automatic Instrument Co.,* 160 F.2d 878, 883 (6th Cir.1947) ("A license contract which conveys the right to make, use and vend for the entire term of the patent is an assignment vesting title to the entire patent in the assignee.").

■ Further, the agreement gives Sybron the right to sue patent infringers. This right is a fundamental characteristic of a patent assignment, and is a right that a patent licensee conspicuously lacks. "[W]hen the transfer amounts to a license only, the title remains in the owner of the patent; any suit must be brought in his name, and never in the name of the licensee alone unless that is necessary to prevent a total lack of justice...." *Waterman v. MacKenzie,* 138 U.S. at 255, 11 S.Ct. at 335. *See also Eickmeyer v. United States,* 10 Cl.Ct. 598, 231 U.S.P.Q. (BNA) 820, 821 (1986) (where no right to sue has been transferred, transferee has

received a license). Under the agreement here, Lansing gave Sybron the unfettered right to sue patent infringers in its own name and in the first instance. (Agreement, Part II, ¶ 8(a)). This demonstrates that the parties intended to transfer from Lansing to Sybron total ownership rights in the patent. The only way Lansing could bring a patent infringement suit is if Sybron elected not to do so. (Agreement, Part II, ¶ 8(b)).

■ In fact, the only rights Lansing retained under the agreement were rights contingent upon Sybron's failure to exercise a right it had gained: Lansing could (1) demand reconveyance of the patent if Sybron failed to make minimum royalty payments (Agreement, Part II, ¶ 3(d)), (2) maintain Licensed Patents if Sybron elected not to maintain such patents (*id.,* Part II, ¶ 7(a)), (3) file patent applications covering Licensed Inventions if Sybron elected not to file such applications (*id.,* Part II, ¶ 7(b)) and (4) terminate the agreement if Sybron was in material breach (*id.,* Part II, ¶ 9(b)). These are all contingent rights, none of which " 'interfere with the full use of the patent by the assignee ...'." *Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 1017, 180 Ct.Cl. 1071 (1967), quoting *Rollman v. Commissioner,* 244 F.2d 634, 640 (4th Cir.1957). That Lansing retained such contingent rights does not destroy the assignment. *Transducer Patents Co. v. Renegotiation Board,* 492 F.2d 247, 249 (9th Cir.1973) ("[E]xistence of a term providing for recapture of the patents in default of payment does not convert an otherwise valid assignment into a license."); *Bell Intercontinental Corp. v. United States,* 381 F.2d at 1013 ("so long

---

**5.** "Licensed Method" is defined as "methods covered by one or more claims of a valid unexpired license." (Agreement, Part II, ¶ 1(d)).

"Licensed Instruments" are defined as "instruments covered by or including components covered by, one or more claims of a valid unexpired Licensed Patent in the country of manufacture, use or sale." (*Id.,* Part II, ¶ 1(c)).

"Licensed Patents" are defined as "United States Application No. 472, 910, filed May 23, 1974 [which resulted in the '055 patent]; any continuations, divisions, continuations-in-part or substitutions for said patent applications; any corresponding applications for Letters Pat-

ent in other countries; any Letters Patent issuing upon said applications and reissues of or patents of addition relating thereto; and any applications for Letters Patent or Letters Patent owned or controlled by LANSING claiming improvements (as defined in subparagraph (e)) to the instruments and methods disclosed in U.S. Application 472, 910." (*Id.,* Part II, ¶ 1 (a)).

"Improvement" is defined as "modifications to the instruments and methods described in U.S. Patent Application 472,910 which are covered by an original claim of that application or an equivalent foreign application." (*Id.,* Part II, ¶ 1(e)).

as [the transferee] lived up to the terms of its agreement, there was no way in which [the transferor] could recapture its patent or even manufacture for its own use without the consent of [the transferee].''); *Hook v. Hook & Ackerman, Inc.*, 187 F.2d 52, 58 (3d Cir.1951) (''Forfeiture clauses for nonperformance of conditions do not prevent title to a patent from passing to an assignee.'').

Sybron attaches undue significance to the fact that the agreement consistently uses the word "license." (Sybron memo at 8–9). "Whether the transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Waterman v. MacKenzie*, 138 U.S. at 256, 11 S.Ct. at 335. The legal effect of the agreement was to transfer all the substantial rights in the patent to Sybron. It makes no legal difference that the parties used the word "license" to describe their relationship. They could have called it whatever they pleased; it is still an assignment. *See also Watson v. United States*, 222 F.2d 689, 691 (10th Cir.1955) (consistent use of "license," "licensor" and "licensee" "did not fix, limit, or qualify the scope of the grant.'').

■ Sybron argues that regardless of whether the agreement created an assignment or a license, its obligation to pay "royalties" to Lansing makes *Lear* automatically applicable and requires a finding that it would have been permitted to challenge the patent's validity in the Lansing litigation. (Sybron reply, at 5–6). However, in *Coast Metals, Inc. v. Cape*, 205 U.S.P.Q. (BNA) 154, 157 (D.N.J.1979), the court, in holding that the agreement there was an assignment, observed that the "royalties" were no more than "compensation for the transfer of the patents, in the way of commissions on sales, and not by way of 'royalties' for a license under patents whose ownership was retained." *See also Bell Intercontinental Corp. v. United States*, 381 F.2d at 1011 ("Nor is the question [of whether a transfer is a assignment or a license] governed by the method of

payment, and it is, therefore, immaterial that payment is based on a percentage of sales or profits, or on an amount per unit manufactured.''); *Kenyon v. Automatic Instrument Co.*, 160 F.2d at 882 (''... an assignment is not invalidated because there is a reservation of a royalty.''); *Watson v. United States*, 222 F.2d at 691 (payment of "royalties" did not limit or qualify scope of assignment.).

I also reject Sybron's argument that the cases cited by Nixon Hargrave are distinguishable because they are tax cases and cases which discuss standing to sue. Nixon Hargrave correctly observes that cases discussing the characteristics of patent licenses and patent assignments do not recognize such a boundary. (Sybron reply, at 8–9). The analysis is the same, whether the subject matter of the case is tax, contract or patent law. *Cooper–MacDonald, Inc. v. United States*, 559 F.2d 575, 579, 214 Ct.Cl. 481 (1977).

Finally, Justice Bryant observed in the first decision that the agreement "was not so much a licensing agreement as an outright sale of all rights Lansing had to OCP and its related technology.... As the language indicates, Lansing gave up everything it had developed in connection with OCP." (Exhibit E, at 9). Although I am not bound by Judge Bryant's characterization, his studied conclusion after an obviously careful and thorough review of the contract language and the history of the parties' negotiations is persuasive and entitled to some weight.

Therefore, I find as a matter of law that the agreement between Sybron and Lansing was an assignment to Sybron of the ownership rights in the '055 patent.

## The "Doctrine" of Assignee Estoppel

■ Because I conclude that the agreement created an assignment, I must now determine whether Sybron, as assignee, would have been estopped in the Lansing litigation from asserting its affirmative defenses alleging patent invalidity.

### a. *Existence of the doctrine*

Initially, although I recognize that "Sybron does not seriously dispute the exist-

ence of the assignee estoppel doctrine" (letter brief at 1), it has not escaped me that the "legal doctrine of assignee estoppel" is not exactly a jurisprudential fixture. Since *Lear*, few courts have addressed whether *Lear* should be extended to permit assignees of patent rights to challenge the validity of the patent, or whether patent assignees should be estopped from making such challenges. Because of this dearth of authority, I must make a threshold determination as to whether the state court would have recognized and applied assignee estoppel.

This situation is similar to one in which a federal court is called upon to determine an unclear or unsettled question of state law. *See Brastex Corp. v. Allen International, Inc.*, 702 F.2d 326, 330 (2d Cir.1983); *Kuwait Airways Corp. v. Ogden Allied Aviation Services*, 726 F.Supp. 1389 (E.D.N.Y.1989). In such a situation, the federal court must determine how the highest state court would decide the issue and rule accordingly. *Kuwait Airways*, 726 F.Supp. at 1395. The necessary (and not unreasonable) assumption is that both courts are competent, and that the well-considered conclusion of the two courts will be the same.

I recognize that such cases are not directly analogous to the instant case, insofar as the task for the federal court in those types of cases is to ascertain what the state court would do if it were faced with a hypothetical case, necessarily identical in all respects to that which is pending before the federal court. In contrast, the instant situation calls for me to determine how a state court would have decided an unclear issue of law in a real case that was actually before it, had the parties in the state court squarely addressed the issue. The difference is that, in the hypothetical case, I can be sure, after I have heard the arguments for and against assignee estoppel, that the state court judge would have heard the same arguments. Therefore, I

can assume that my own well-considered conclusion would be the same as that of the state court judge, even though neither of us has the benefit of binding precedent. I cannot make the same assumption in the instant case because I cannot be sure that Justice Bryant was squarely presented with the assignee estoppel issue in the Lansing litigation. However, this barrier disappears if I treat this uncertainty as a question of fact to be established, and assume (for the moment) that it has been so established.[6] By doing so, I can address assignee estoppel on the merits with confidence that the state court would have reached the same conclusion.

Nixon Hargrave cites three cases in support of its position that the *Lear* reasoning should not extend to assignee estoppel. Although, as Sybron notes, each of these three cases is factually distinguishable from the instant case, the cases are nonetheless instructive.[7] The first case, *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220 (Fed.Cir.), *cert. dismissed*, 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988), is of only limited value, inasmuch as it involved *assignor* estoppel, and recognized only in dictum that "[i]f an assignee of a patent were allowed to challenge the patent, it could be placed in the legally awkward position of simultaneously attacking and defending the validity of the same patent." 848 F.2d at 1224.

The second case upon which Nixon Hargrave relies is *Roberts v. Sears Roebuck & Co.*, 573 F.2d 976 (7th Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978). In that case, the Seventh Circuit refused explicitly to extend the *Lear* reasoning to a patent assignee, and did not allow the defendant-assignee to assert patent invalidity as an affirmative defense to the plaintiff-assignor's claims of fraud, breach of a confidential relationship and negligent misrepresentation.

---

6. It is precisely because a question of fact exists as to whether Lansing waived assignee estoppel in the Lansing litigation that Nixon Hargrave's assignee estoppel argument fails at this point in the litigation. (*See infra*).

7. As a practical matter, I would be surprised to find a case squarely on point factually with the instant case.

The *Roberts* Court gave two reasons for its refusal to extend *Lear*. First, while *Lear* involved a license, *Roberts* involved a complete assignment of patent rights to the transferee. This distinction is significant because the *Lear* Court was concerned that if a licensee is barred from challenging the patent's validity, it is likely that no one else will have enough economic incentive to challenge it. Thus, an invalid patent will likely go unchallenged and the public will continue to pay "tribute" to the licensor for an invalid patent. No such danger exists in the assignment context for the simple reason that the assignor has transferred all the substantial rights in the patent. The assignor thus has nothing left, and has no legal basis to exact "tribute" from the public. Therefore, the policy reasons which justify allowing a licensee to assert patent invalidity against the licensor and to escape the duty to pay royalties do not justify allowing an assignee to avoid its contractual duty to the assignor to make full payment for what it has received.

Second, and more "fundamental" to the *Roberts* Court, the *Lear* Court had balanced the competing interests of the licensor and the public on the assumption that there had been good faith and fair dealing between the parties. In contrast, the assignee's conduct in *Roberts* clearly demonstrated a failure to deal in good faith, and the equities were decidedly skewed in the assignor's favor.[8] Therefore, the Court held that it was not bound to apply the *Lear* balancing test. "For this court to employ the public interest in patent law to sanction Sears' [the assignee's] conduct is unjustifiable. Certainly nothing in patent law requires this court to permit fraud to go unremedied." *Roberts*, 573 F.2d at 982. Thus, the outcome in *Roberts* was not a result of the *Lear* balance tipping the other way; the Court rejected the propriety of applying the *Lear* balancing factors at all. Consequently, it is impossible to tell whether the *Roberts* Court would have prevented the assignee from attacking the patent had the assignor and assignee therein, as here, been playing on a more level field.

The third case upon which Nixon Hargrave relies is *Coast Metals, Inc. v. Cape*, 205 U.S.P.Q. (BNA) 154 (D.N.J.1979). That case squarely held that an assignee of a patent was estopped from asserting the patent's invalidity. Like *Roberts*, the *Coast Metals* Court recognized that the policy consideration which permits a licensee to attack the validity of a patent is absent in the assignment context. Additionally, it was apparently significant in *Coast Metals* that the plaintiff-assignee had itself initiated the lawsuit, and was seeking a declaration that the subject patent was invalid.

I find the reasoning in *Coast Metals* to be persuasive. The reasons for estopping the assignee from asserting patent validity therein are the same as those involved in the instant case. Under a contrary rule, "... the buyer of a patent could obtain its benefits and control it and refuse to pay the agreed consideration. The transaction is a 'bargain and sale' of its subject matter and the amount agreed to must be paid." *Coast Metals*, 205 U.S.P.Q. at 157–58. Further, because under the agreement Sybron gained ownership of the patent, there would be no danger that Lansing could reap benefits from a potentially invalid patent which is likely to go unchallenged. Thus, the danger articulated in *Lear* which outweighed the licensor's interest in enforcing the contract and justified allowing the licensee to avoid royalty payments is nonexistent here.

**8.** In *Roberts*, the assignee had fully performed under the assignment contract. However, the profits the assignee realized from the assigned patent were grossly disproportionate to the $10,-000.00 the assignee had paid to the assignor for the patent. The assignor thereafter sued to rescind the contract and get his patent back because the assignee had acted fraudulently. In response, the assignee asserted patent invalidity, but not in an attempt to avoid the contract. Rather, the assignee argued that the district court should have determined whether the patent was invalid, because if it was, the assignor could not have suffered any damages as a result of the assignee's alleged fraud, because the assignor would have received $10,000.00 for his "worthless" invention. 573 F.2d at 980–81.

It is not significant, as Sybron argues, that the assignee in *Coast Metals* was a plaintiff attempting to have the patent declared invalid while Sybron was a defendant in the Lansing litigation asserting invalidity as an affirmative defense. (Sybron memo, at 8). Other than pointing out this difference, Sybron articulates no reason to justify treating the assignee who uses patent invalidity as a defensive measure differently from the assignee who uses it as an offensive measure. In either situation, permitting the owner/assignee to assert patent invalidity allows it to escape its obligation to make full payment for the patent it had purchased.

### b. *Standing*

Sybron also argues that Nixon Hargrave lacks standing to assert the doctrine of assignee estoppel against Sybron, and that only Lansing, as assignor, could have asserted it. (Sybron reply memo, at 8–10). This argument misconstrues the issue on this motion. Nixon Hargrave does not invoke the doctrine on its own behalf; the sole question here is whether, by properly interposing assignee estoppel, Lansing would have prevented Sybron from successfully asserting patent invalidity in the Lansing litigation. The issue of whether Nixon Hargrave has standing to assert assignee estoppel against Sybron on its own behalf in this litigation is not before me, and I make no ruling on the matter.

### c. *Waiver*

The question still remains as to whether Lansing properly interposed assignee estoppel in the Lansing litigation. Sybron argues that Lansing waived assignee estoppel and instead "chose to litigate patent validity or invalidity on the merits." (Sybron reply memo, at 8). I find that whether Lansing waived assignee estoppel is a question of fact. Thus, a factual scenario exists under which Nixon Hargrave would

be precluded from pursuing its assignee estoppel argument.

Nixon Hargrave argues that Lansing did not waive assignee estoppel because Sybron raised patent invalidity in the Lansing litigation as an affirmative defense and, under the rules of New York practice, Lansing was not required or permitted to serve a responsive pleading. (*See* New York CPLR 3011). This argument ignores the fact that more than the mere exchange of a complaint and an answer occurred in the Lansing litigation. Discovery was conducted, Justice Bryant decided Sybron's motion for summary judgment, Lansing's cross motion for summary judgment and Sybron's renewal motion and both the first decision and the second decision were appealed to the Third Department. At some point during these proceedings, it may have been appropriate for Lansing to have raised assignee estoppel.[9] If such an opportunity to raise assignee estoppel occurred, it would have been incumbent upon Lansing to raise and preserve the argument, or run the risk of waiver.

Therefore, it would be possible for Sybron to defeat Nixon Hargrave's assignee estoppel argument were it established factually that Lansing waived assignee estoppel in the Lansing litigation. Thus, at this stage of the litigation, Nixon Hargrave is not entitled to judgment based on its assignee estoppel argument.

## II. OTHER CONSIDERATION

■ Nonetheless, I find that Nixon Hargrave's argument that the agreement was supported by consideration other than the '055 patent has merit. Thus, Sybron cannot argue that it would have prevailed in the Lansing litigation based on the affirmative defenses of patent invalidity, because the invalidity of the '055 patent, even if proven, would have made no legal difference.

---

**9.** Sybron represents in its papers (Sybron reply, at 10), and Mr. Schroeder represented at oral argument, that Lansing never raised assignee estoppel in the Lansing litigation. However, even were it appropriate for me to consider such questions of fact on this motion to dismiss,

the statement of a party's attorney as to the existence of a fact is certainly not conclusive. Neither would the current record before me be sufficient to address this question, insofar as it does not contain a complete record of the proceedings in the Lansing litigation.

Sybron relies on the doctrine of "eviction" (Sybron reply, at 15), which provides that where a patent provides the consideration for a contract, an adjudication of invalidity of that patent results in " 'a complete failure of consideration—an eviction—which should justify a termination of the contract.' " *Scherr v. Difco Laboratories, Inc.*, 401 F.2d 443, 446 (6th Cir.1968), quoting *Drackett Chemical Co. v. Chamberlain Co.*, 63 F.2d 853, 854 (6th Cir.1933). However, as Nixon Hargrave argues, an eviction occurs only if the adjudication of invalidity entirely deprives the transferee of the bargained-for exchange. (Nixon Hargrave memo, at 8).[10] *Cf. Fugelsang v. Fugelsang*, 131 A.D.2d 810, 517 N.Y.S.2d 176, 177 (2d Dep't 1987) ("Failure of consideration exists wherever one who has promised to give some performance fails without his or her fault to receive in some material respect the agreed quid pro quo for that performance."). I find that even if the '055 patent were declared invalid, such invalidity would not entirely deprive Sybron of its bargained-for exchange. As articulated below, the language of the agreement indicates the consideration Sybron received consisted of more than the '055 patent. Therefore, it would have been legally impossible for Sybron to have succeeded in the Lansing litigation on the SIXTH and SEVENTH affirmative defenses because the agreement would have been enforceable whether or not the '055 patent was invalid.[11]

The agreement is replete with language indicating that Sybron received consideration other than the patent application which ripened into the '055 patent. To begin with, the fourth "WHEREAS" clause to the agreement recites that:

SYBRON wishes to obtain, and LANSING wishes to grant to SYBRON, an opportunity to evaluate the Optical Core Processor and an option to purchase the

aforementioned Optical Core Processor and all rights thereto and to the application for Letters Patent under the terms and conditions set forth herein[.]

(Agreement, at page 2). Thus, at the very outset, the agreement identifies the OCP itself and the patent application (which later ripened into the '055 patent) as two distinct things.

Part I, ¶ 2 of the agreement states that, upon execution of the agreement, Sybron agrees to pay $120,000.00 for an option to purchase the OCP. The agreement recites only that the patent application for the OCP was pending. (Agreement, at page 1). No provision of the agreement contemplates allowing Sybron to recoup this sum if the patent application was denied. Therefore, Sybron obligated itself to pay $120,000.00 before the '055 patent even existed.

Additionally, the agreement provides that upon Sybron's exercise of the option, Lansing was to deliver to Sybron the "evaluation prototype together with the reports and documentation required by paragraph 5(c) of this Appendix ..." which "... items so delivered will become the property of SYBRON...." (Agreement, Appendix A, Part II, § 1). The agreement also anticipates that each party was likely to receive confidential or proprietary information from the other. (Agreement, Part I, ¶ 7(a)). These provisions contemplate that Sybron would receive more than the '055 patent.

Further, pursuant to Part II, ¶ 2 of the agreement, Sybron's "exclusive worldwide license" entitled Sybron "to practice Licensed Methods and to make, have made, use and sell Licensed Instruments...." The agreement defines "Licensed Methods" and "Licensed Instruments" in terms of methods or instruments covered by a "Licensed Patent," which in turn, encom-

---

**10.** Sybron makes no argument that Lansing failed to make this legal argument in the Lansing litigation. Therefore, the question of waiver which exists with regard to assignee estoppel does not exist with regard to the failure of consideration argument.

**11.** I am able to find support for this conclusion solely from the unambiguous terms of the agreement itself. Therefore, I need not explore, as Nixon Hargrave urges, the facts surrounding "the actual, known circumstances in March, 1978 when Sybron exercised its purchase option." (letter brief, at 5).

passed more than just the '055 patent. (See footnote 5, *supra*). Part II, ¶ 3 of the agreement refers to the consideration provided to Sybron as "licenses and *other rights* granted herein...." (emphasis added), and Sybron's obligation to pay royalties is defined in term of sales of "Licensed Instruments" (Agreement, Part II, ¶ 3), which, as is evident from the contractual language, covers instrumentality in addition to that which was to be protected by the '055 patent.

Thus, after my own examination of the agreement, I agree with Justice Bryant's assessment that the language of the agreement indicates that "Lansing gave up everything it had developed in connection with OCP.... It had surrendered its technology and its exclusive rights to OCP." (Exhibit E, at 9).

*St. Regis Paper Co. v. Royal Industries*, 552 F.2d 309 (9th Cir.), *cert. denied*, 434 U.S. 996, 98 S.Ct. 633, 54 L.Ed.2d 490 (1977), does not compel a contrary result. In that case, the agreement contained a specific provision stating that the licensee could terminate the agreement if the patent was declared invalid. The court found that the licensor's "attempt to separate the know-how from the patent rights and to enforce the agreement for know-how alone" was inconsistent with that provision. 552 F.2d at 315. In contrast, the agreement in this case is silent as to the continuing validity of the agreement should the '055 patent be declared invalid. This might be explained by the fact that the '055 patent had not yet been granted at the time the agreement was executed. However, the agreement is also silent as to what would happen if the pending patent application was denied. This further indicates that the '055 patent was not, as Sybron argues, "the material and crucial element of the contract." (Sybron reply, at 14).

Nor is *Oshkosh Truck Corp. v. Lockheed Missiles & Space Co., Inc.*, 678 F.Supp. 809 (N.D.Cal.1987), necessarily contrary to my conclusion. *Oshkosh* involved a License Agreement which conveyed to the licensee an exclusive right to a U.S. patent, two design patents, certain "Proprietary Information," a registered trademark and the goodwill symbolized by it in exchange for royalty payments. Following a jury finding that the U.S. patent was invalid and unenforceable, the Court ordered that the License Agreement was no longer enforceable. 678 F.Supp. at 811. However, as Nixon Hargrave points out (letter brief, at 6), the *Oshkosh* court had ruled earlier in that litigation that the two design patents were inapplicable to the licensee's obligation to pay royalties because the licensee had not made or sold any products covered by the design patents. 678 F.Supp. at 810. Moreover, I do not have the *Oshkosh* License Agreement in front of me; therefore, I cannot determine, and the reported decision does not tell me, whether that Agreement's language was similar to that of the agreement in this case. Thus, *Oshkosh* can have no bearing on the specific analysis of the Sybron/Lansing agreement language which I have detailed above.

Therefore, Sybron shall be precluded from further arguing that, but for Nixon Hargrave's negligence, it would have prevailed in the Lansing litigation based on the SIXTH and SEVENTH affirmative defenses alleging patent invalidity.

### III. FRAUD AND MISREPRESENTATION DEFENSES

■ However, I am prevented from granting Nixon Hargrave's motion to dismiss because factual questions exist regarding the affirmative defenses of fraud and negligent misrepresentation asserted by Sybron in the Lansing litigation. Nixon Hargrave's argument with regard to the patent invalidity defenses is that regardless of whether Nixon Hargrave was negligent in pressing those defenses, they would have failed because of specific *legal* impediments. I have found that one of those impediments, namely, the legal fact that the agreement was supported by consideration other than the potentially invalid '055 patent, is sufficient to show that even if Nixon Hargrave was negligent, Sybron's SIXTH and SEVENTH affirmative defenses would have been ineffectual.

However, Nixon Hargrave cannot make a similar legal argument with regard to the affirmative defenses of fraud and misrepresentation (the THIRD and FOURTH affirmative defenses in the Lansing litigation). Keeping in mind the standard on a motion to dismiss, Nixon Hargrave has not shown that there is no set of facts under which Sybron could prevail. Specifically, Sybron could prevail if it shows that the THIRD and FOURTH affirmative defenses had merit, that Nixon Hargrave was negligent in failing to preserve the THIRD and FOURTH affirmative defenses, and that absent such negligence, Sybron would have prevailed in the Lansing litigation. *See Romanian American Interests, Inc. v. Scher, supra,* 464 N.Y.S.2d 821, 824. Nixon Hargrave has not shown that recovery under such a scenario is legally impossible, and Sybron must have the opportunity to establish facts which support it, or some other set of facts under which it could recover. Nixon Hargrave's argument that the "undisputed facts" show that Sybron could not prove the requisite element of reliance (Nixon Hargrave memo, at 17), and thus the affirmative defenses alleging fraud were without merit, is inappropriate on this motion to dismiss.

## CONCLUSION

For the reasons articulated above, Nixon Hargrave's motion to dismiss in denied. However, Sybron is precluded from further arguing that it would have prevailed in the Lansing litigation based on the SIXTH and SEVENTH affirmative defenses alleging patent invalidity.

## ORDER

IT HEREBY IS ORDERED, that Nixon Hargrave's motion pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted is DENIED.

SO ORDERED.