**BALADEVON, INC., Plaintiff,**

v.

**ABBOTT LABORATORIES, INC., Defendant.**

**Civ. A. No. 92–10283–PBS.**

United States District Court, D. Massachusetts.

Dec. 20, 1994.

---

Richard M. Gelb, Gelb & Gelb, Boston, MA, for plaintiff.

James S. Franchek, Isaac H. Peres, Joseph R. Valle, Jr., Riemer & Braunstein, Boston, MA, Mark E. Barmack, Abbott Part, IL, for defendant.

## MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

SARIS, District Judge.

### INTRODUCTION

This case marks the crossroads of patent and contract law. Plaintiff seeks to enforce an agreement which assigned patent, trademark and other non-patent rights in a device which was potentially patentable, but not yet patented. When the patents which subsequently issued on the device became generally recognized as invalid, defendant terminated payment of the royalties due under the assignment, but continued manufacturing the device and exercising other non-patent rights, notably trademark rights.

Both sides have filed cross-motions for summary judgment. After hearing, the Court *ALLOWS* plaintiff's motion in part, and *DENIES* defendant's motion.

### BACKGROUND

This case revolves around the "enteral feeding device," a device for feeding patients directly through the stomach, invented by the eminent radiologists Barry A. Sacks and Hugh S. Vine. Plaintiff is a corporation owned by the Sacks family, and is the assignee of Dr. Vine's claims.

In March of 1986, Baladevon reached an agreement with Microvasive, Inc., a division of Boston Scientific, Inc., a developer, producer and seller of medical products. At the time, an application for one patent, filed on

May 17, 1985, was pending, and an application for a second was not yet in the works. Under the terms of the agreement, Baladevon and Dr. Vine assigned to Microvasive the following bundle of rights:

> any rights they may have to [the device and the method for using it that were conceived and developed by Microvasive with their help], to any improvements therein, to the use of the names "Sacks" and "Vine" with respect thereto and to any other rights they may have with respect to the manufacture, use or sale of products that incorporate such concepts, developments or improvements.

In return, Baladevon and Dr. Vine were each to receive 2.5% in royalties through the end of the decade, with the amount to be renegotiated six months before the beginning of 1990, or sooner in the case of certain enumerated events. Most notably, if "a device of comparable design is sold in direct competition," Baladevon and Vine agreed to "consider a reasonable reduction in royalty in order to share the burdens of such events and ensure that Microvasive may continue to sell products without a competitive disadvantage." For the period January 1, 1990 to December 31, 1990, the parties agreed to negotiate over a royalty no less than 1¼ percent or more than 3¾ percent, taking into account, among other things, "devices which are of comparable design and operation and sold in direct competition with products." Any disputes were to be resolved by binding arbitration.

The agreement gave Microvasive the right, but not the legal obligation, to seek and enforce patents for the inventions and improvements, and gave it the "perpetual royalty free" right to use the names Sacks or Vine as a trademark. (Article 4). Microvasive agreed to pay all costs and expenses incurred in connection with all United States and foreign patent applications and patents. The agreement explicitly applies to inventions and improvements "whether patentable or not."

This litigation hinges on the termination provision, article 9(a), which provides as follows:

> This Agreement shall be terminable in whole *or in part* by Microvasive by giving written notice thereof and by assigning to Baladevon and Vine any patents included in Subject Patent Rights which pertain to the part of the Agreement being terminated and neither party shall thereafter have further obligations to the other party with respect to such part of the Agreement. (Emphasis added).

The term of the agreement was August 1, 1984 to December 31, 1994. On August 13, 1987, the defendant, Abbott Laboratories, Inc., entered the picture for the first time. On that day, the Ross Laboratories division of Abbott acquired the enteral feeding device product line from the Microvasive division of Boston Scientific. In the process, defendant acquired all of the original assignee's rights and obligations under the agreement.

The initial patent application resulted in the issuance of a patent in July, 1988. Defendant also applied for a second patent, which issued. Baladevon and Vine (the assignors) did not own or have any interest in the patents; rather Boston Scientific's employees and Dr. Sacks (who is not a party to the agreement) were the inventors listed in the patent application. Then the unexpected occurred. It came to light that Dr. Sacks had published an article containing the ideas embodied in the enteral feeding device over a year before the first application, a fact that rendered both patents invalid *per se*. *See* 35 U.S.C. § 102(b).[1] Competitive devices appeared on the market.

On July 14, 1989, defendant notified plaintiff by letter of its intent to "terminate *in part*" (emphasis added) and to assign the patents back under the agreement's termination clause, citing concerns "regarding the validity and enforceability of these patents." Plaintiff's Exh. S. Defendant continued to

---

1. The patent has never been judicially declared invalid. Neither party has asked this Court for such a declaration, or filed an infringement suit against competing producers. On the contrary, both parties concede invalidity for purposes of this lawsuit. There is no evidence in this record from which the Court can determine which of the parties, if any, was responsible for the defective application process.

produce and sell enteral feeding devices under the names "Sacks" and "Vine," without paying plaintiff any royalties. Abbott's registration of the Sacks–Vine trademark became effective on September 26, 1989, two months after Abbott terminated the agreement "in part."

Plaintiff filed suit in this court under a variety of contract theories. A cogent memorandum, issued by Judge Woodlock on July 6, 1992, dismissed all claims except those for breach of contract and for an accounting. With regard to the remaining claims, the court found that two key provisions of the contract are ambiguous: those governing trademark rights and termination rights. The court concluded that, because these two provisions, read in context, were each susceptible of different reasonable interpretations, they presented questions of fact that could not be resolved on a motion to dismiss. Memorandum and Order at 17 (citing *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir.1981)).

### DISCUSSION

#### 1. *Summary Judgment Standard*

A motion for summary judgment must be granted if:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted). The nonmovant cannot simply rest upon mere allegations. *Id.* Instead, the nonmoving party must adduce specific, provable facts which establish that there is a triable issue. *Id.* Rule 56(e) "requires nonmovants to submit evidence that would be admissible at trial to oppose properly submitted motions for summary judgment." *Federal Deposit Ins. Corp. v. Fonseca*, 795 F.2d 1102, 1110 (1st Cir.1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers, supra* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)).

#### A. *Count I*

As a preliminary matter, this court grants plaintiff summary judgment on Count I. The count states a claim for contract damages arising from defendant's alleged underpayment of royalties *before* termination. It would be difficult to quibble with plaintiff's argument that it should prevail on the basis of defendant's admission to the fact that:

Abbott's royalty payments to Baladevon, Inc. and Hugh S. Vine M.D. under the Agreement ... during the period from 1987 through 1989 prior to the termination of such royalty payments were less than 2.5% each of the Net Receipts as that term is used in the Agreement.

Plaintiff's Exh. E.

In fact, defendant has not opposed this portion of plaintiff's demand for summary judgment, and has not submitted any admissible evidence to dispute plaintiff's contention that it is owed $37,176.00. Defendant filed an offer of judgment pursuant to Fed. R.Civ.P. 68. Although it was not accepted in a timely way, defendant has not demonstrated that it is entitled to any costs incurred after the making of the offer.

#### B. *Counts II and III*

The issues surrounding the remaining two counts are considerably more complex. Count II involves a claim for contract damages arising after termination of the agreement, and Count III requests an accounting. Defendant argues that plaintiff's interpretation of the termination clause—which would obligate defendant, upon termination, to either cease production of the enteral feeding device or pay royalties to plaintiff, despite

the invalidity of the patents—is fatally inconsistent with patent law policy.

### 2. Lear and its Family

The seminal case is *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). There, the inventor sued the licensee for using his invention after ceasing royalty payments; the licensee filed a counterclaim for patent invalidity. Two landmark holdings resulted. First, in allowing the licensee to challenge the validity of the patent, the *Lear* Court abolished the state law doctrine of licensee estoppel. Second, the *Lear* Court held that the licensee was not liable for royalties on invalid patents from the moment it challenged their validity.

The *Lear* court characterized the question presented as "whether federal patent law policy bars a State from enforcing a contract regulating access to an unpatented secret idea." 395 U.S. at 672, 89 S.Ct. at 1912. With respect to royalties accruing after the patent issued, the answer was "yes," because "federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent." 395 U.S. at 668, 89 S.Ct. at 1910. More specifically, the Court reasoned that the relegation of unpatentable ideas to the public domain was necessary to ensure that inventors did not reap benefits from an invalid patent; and the only way to put such ideas where they belonged was to give licensees the incentive to make validity challenges. 395 U.S. at 670, 89 S.Ct. at 1911. However, the Court declined to address the claim to royalties before the patent issued "since it squarely raises the question whether, and to what extent, the States may protect the owners of unpatented inventions who are willing to disclose their ideas to manufacturers only upon payments of royalties." 395 U.S. at 674, 89 S.Ct. at 1913.

*Lear* is conventionally grouped with two other Supreme Court cases that grappled with conflicts between patent law and contract law. In *Brulotte v. Thys Co.*, 379 U.S. 29, 32, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964), the Court held that a contract requiring a licensee to pay royalties after a patent expired was per se unlawful because the patent owner had abused the leverage of the monopoly to project royalties into the period after expiration.

A different principle is embodied in *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 259, 99 S.Ct. 1096, 1097, 59 L.Ed.2d 296 (1979), a case decided ten years after *Lear*. In *Quick Point*, which involved a royalty agreement covering patent rights and trade secrets, the Court considered "whether federal patent law preempts state contract law so as to preclude enforcement of a contract to pay royalties to a patent applicant, on sales of articles embodying the putative invention, for so long as the contracting party sells them, if a patent is not granted." Pointing out that the parties contracted with "full awareness of both the pendency of a patent application and the possibility that a patent might not issue," it held:

> Commercial agreements traditionally are the domain of state law. State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable; the states are free to regulate the use of such intellectual property in any manner not inconsistent with federal law.

440 U.S. at 261–262, 99 S.Ct. at 1099. The Court found no merit in the contention that enforcement of the agreement withdrew any idea from the public domain because the design, although not patentable, entered the public domain as a result of the manufacture and sale of the design under the contract. The Court also pointed out that the agreement set two different royalty fees, depending on whether or not the patent issued. Although a pending patent application gives the applicant some additional bargaining power, the court stated the "amount of leverage depends on how likely the parties consider it to be that a valid patent will issue." 440 U.S. at 265, 99 S.Ct. at 1101.

The Court distinguished *Lear* as not controlling "when no patent has issued, and no ideas have been withdrawn from the market place." 440 U.S. at 264, 99 S.Ct. at 1100. *Brulotte* was distinguished on the grounds that the patent owner in *Quick Point* had not attempted to use her monopoly as leverage during negotiation of the licensing contract.

The Court concluded that federal patent law is not a barrier to enforcement of "contractual obligations, freely undertaken in arm's-length negotiation and with no fixed reliance on a patent or a probable patent grant." 440 U.S. at 266, 99 S.Ct. at 1101.

The Federal Circuit has been leery of a blind application of *Lear.* In an extensive discussion, the court essentially confined the case to its facts:

> *Lear* ... precluded the award of royalties to the licensor under the facts of *that case* from the date the patent issued if the patent were later held invalid. *Lear* does not in fact ... deal with a licensor's right to terminate or rescind a license agreement, or dictate what *must* be held a breach of contract, or what damages *must* be awarded for a breach, or under what circumstances, if any, a licensee can recover royalties paid. Those questions continue to be matters dependent on particular fact situations, contract provisions and state contract law, albeit they must be resolved in harmony with general principles discernible from *Lear.*

*RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 1064 (Fed.Cir.1989) (emphasis in original). Thus, the public policy expressed in *Lear* is not so overpowering that it may overcome the especially strong countervailing policy in favor of enforcing contracts that take the form of judicial settlements, *Hemstreet v. Spiegel, Inc.,* 851 F.2d 348, 350–51 (Fed.Cir.1988), or consent judgments, *Foster v. Hallco Mfg. Co.,* 947 F.2d 469, 477 (Fed. Cir.1991). It is also possible, at least by some means, to contract around the *Lear* doctrine. *See Sun Studs, Inc. v. ATA Equipment Leasing, Inc.,* 872 F.2d 978, 991–93 (Fed.Cir.1989) (holding that *Lear* policy of encouraging challenges to patent validity does not require court to void contract provision obligating assignee to protect, defend and enforce the patent and to preserve the confidentiality of information).

### 3. Hybrid Royalty Agreements

■ Defendant argues that the agreement here is unenforceable after *Lear.* Four Circuits have struggled with the question of the enforceability of "hybrid royalty agreements"—agreements, such as the one before the court, that exchange royalties for a mix of patent and non-patent rights—after *Lear, Brulotte* and *Quick Point.* A consensus has emerged. Where a licensing agreement fails to distinguish between patent and non-patent rights in royalty payments, and a patent is invalidated, *Lear* precludes enforcement of the contract according to its terms but does not preclude compensation for the non-patent rights. *Chromalloy v. Fischmann,* 716 F.2d 683, 685 (9th Cir.1983) (where a royalty agreement was part of a sale of ongoing business, seller was not entitled to compensation for royalty payments on the invalid patent although court could award compensation on transfer and use of non-patent assets); *Span–Deck, Inc. v. Fab–Con, Inc.,* 677 F.2d 1237, 1246–1249 (8th Cir.), *cert. denied,* 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982) (although hybrid royalty agreement was unenforceable because there was no allocation of the percentage of royalties attributable to trade secrets and know-how, licensor was entitled to compensation for non-patent rights to prevent unjust enrichment); *St. Regis Paper Co. v. Royal Inds.,* 552 F.2d 309, 315 (9th Cir.), *cert. denied,* 434 U.S. 996, 98 S.Ct. 633, 54 L.Ed.2d 490 (1977) (although court could not enforce royalty agreement which failed to distinguish between patent rights and non-patent rights such as know-how, it could award compensation for non-patent rights).

Moreover, two federal courts have suggested that agreements which specifically provide for separate allocation of payments of royalties for patent and non-patent rights may well survive after expiration or invalidity of the patents despite the *Brulotte* rule of *per se* invalidity. *See Boggild v. Kenner Prods. Div.,* 776 F.2d 1315, 1319 (6th Cir.1985) (holding that *Brulotte* rule of *per se* invalidity precludes enforcement of license agreement which was developed in "clear contemplation" of patent protection, which requires royalty payments for use, sale or manufacture of patented item for twenty five years, and which "contains neither provisions for reduction of royalties in the event valid patents never issued nor terms for reduction of post-expiration royalties"); *Pitney Bowes, Inc. v. Mestre,* 701 F.2d 1365, 1372 (11th Cir.1983)

(holding *Brulotte* was applicable to hybrid agreements concerning patent and trade secret rights, and that non-issuance of the pending patent precluded enforcement where there was no allocation in the agreement between trade secrets and patent rights).

Neither the First Circuit nor the Supreme Court has ever addressed the question whether a hybrid agreement in which patents issue can ever survive the expiration or invalidation of the patents where there is a provision for allocation of payments between patent and non-patent rights.

### 4. *The Application of Lear to this Case*

■ There are two crucial factors which support enforceability of this hybrid royalty agreement under this line of cases. First, the contract here took the form of an assignment rather than a licensing arrangement. Second, the assignment agreement provided a mechanism for reducing the royalties to reflect competition in the marketplace should the patent not issue or prove invalid.

#### a. *The assignment*

■ No party disputes that the agreement is, both in form and substance, an assignment. An assignment is a conveyance of a *complete* bundle of rights, including title to the invention and the right to sue infringers. *See CMS Indus. Inc. v. L.P.S. Int'l, Ltd.*, 643 F.2d 289, 294 (5th Cir.1981) (defining an assignment as a conveyance which "effectively transfers the entire bundle of common law rights presiding in a patent"). An agreement which grants the "exclusive right to make, use and vend the invention" is an assignment, not a license. *Waterman v. Mackenzie*, 138 U.S. 252, 255–56, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891).

A license "merely grants a party permission to do something which would otherwise be unlawful; it grants immunity from suit rather than a proprietary interest in the patent." *Public Varieties of Mississippi, Inc. v. Sun Valley Seed Co.*, 734 F.Supp. 250, 252 (N.D.Miss.1990); *see also Sybron Transition Corp. v. Nixon, Hargrave, et al.*, 770 F.Supp. 803, 808–09 (W.D.N.Y.1991).

■ Outside of licensee estoppel, which is commonly understood to have been abolished by *Lear*, the status of estoppel doctrines in patent law has not been definitively settled. The weight of authority holds that the doctrine of assignee estoppel survived *Lear*. *See Sybron*, 770 F.Supp. at 811 ("the policy reasons which justify allowing a licensee to assert patent invalidity against the licensor and to escape the duty to pay royalties do not justify allowing an assignee to avoid its contractual duty to the assignor to make full payment for what it has received"); *Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 982 (7th Cir.1978), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978) ("the primary evil that the Court in *Lear* sought to end, that the public might have to pay tribute to a 'would-be monopolist' is completely irrelevant to this case [involving a complete assignment of rights] )"; *Coast Metals Inc. v. Cape*, 205 USPQ 154, 1979 WL 25083 (applying assignee estoppel where assignee got the benefit of the bargain). *See also Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224–25 (Fed.Cir.), *cert. dismissed* 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988) ("[i]f an assignee of a patent were allowed to challenge the patent, it would be placed in the legally awkward position of simultaneously attacking and defending the validity of the same patent"). On the other hand, some courts have refused to apply assignor estoppel. *See, e.g., Interconnect Planning Corp. v. Feil*, 543 F.Supp. 610 (S.D.N.Y.1982) (rejecting assignor-inventor estoppel when assignee sues assignor for infringement). Whether estoppel should be applied in a particular case, the Federal Circuit has suggested, should be determined by balancing the equities. *See Diamond Scientific*, 848 F.2d at 1224–25 (justifying application of the generally disfavored doctrine of assignor estoppel).

The equities strongly favor the application of estoppel in this case.[2] There is no evi-

---

2. The lines are somewhat blurred, because—having assigned the patent back to Baladevon—defendant might now be characterized as the assignor, rather than the assignee. The taxonomy has no bearing on the inquiry followed by this court. To avoid confusion, defendant will consistently be referred to as the assignee.

dence that plaintiff exercised the increased leverage of an anticipated patent monopoly based on the parties' expectation of a high likelihood that valid patents would issue. *Contrast Boggild,* 776 F.2d at 1321. To the contrary, the undisputed evidence is that the issuance of the patents was not a significant factor in the agreement (*see* undisputed fact # 35). Moreover, the terms of the agreement reflect an equality of bargaining power; for example, there is a provision that plaintiff's fees would be reduced in the event of a challenge to the patent or market competition. Finally, the agreement does not purport to extend a royalty agreement beyond the life of the patent.

Furthermore, neither of the two policy rationales supporting the abrogation of estoppel in *Lear* are relevant to the weighing of equities in this case. The two concerns, it will be recalled, were that a patent's validity might go unchallenged, and that the public would continue to pay tribute for an invalid patent. *See* 395 U.S. at 670, 89 S.Ct. at 1911. By the time of defendant's termination in this case, the patents had already been widely revealed as invalid and competitive products were on the market. Thus, there is obviously no concern, as there was in *Lear,* that the patent monopoly would continue to be honored lest the defendant be given an incentive to challenge patent validity.

A little thought about the nature of assignments reveals that the other concern of *Lear* is equally invalid here. Royalties in a licensing agreement are an ongoing obligation, continually exchanged for an ongoing right. By contrast, royalties in an assignment agreement are properly conceived as deferred consideration for the original conveyance of rights, with the amount of consideration pegged to the commercial success of the product. *See Sybron,* 770 F.Supp. at 809; *Coast Metals,* 205 USPQ at 157.

At the time of the agreement in this case, the assigned bundle of rights included the rights to use and sell an invention that was potentially but not certainly patentable. It also included the right to use Sacks' and Vine's names and to obtain trademark registration for these names. In return, the assignors received payment in the form of roy-

alties. Under plaintiff's interpretation of the agreement, Baladevon would be entitled to some amount of royalties throughout the contract term as long as the defendant continued to manufacture—regardless of whether the inventions or improvements were "patentable," regardless of whether patents issued or not, regardless of the patents' validity, regardless of whether defendant retained ownership of the patents or chose to return them under the termination clause. Unlike those barred by *Lear,* the payments plaintiff demands would not be benefits derived from ownership of invalid patents. Rather, they would be deferred, contingent consideration for the commercially useful, potentially patentable ideas that a sophisticated, self-interested firm contracted to buy in 1986, in order to get the right to be first in the market and in order to use the names of Sacks and Vine. This court concludes that the defendant should in this case be estopped from challenging the enforceability of the agreement based on patent invalidity.

### b. *The royalty renegotiation clause*

There is a second, even more significant, distinction between this case and the line of cases extending *Lear* to the context of hybrid royalty agreements. In each of those cases, the court was compelled to invalidate the whole agreement, because it was impossible to disentangle the consideration given for the invalid patent from the consideration given for non-patent rights. Each court recognized, however, that the plaintiff was still entitled, on the theory of unjust enrichment, to that portion of the consideration (if any) that was designed to compensate it for non-patent rights. *See Chromalloy,* 716 F.2d at 685; *Span–Deck,* 677 F.2d at 1247; *St. Regis,* 552 F.2d at 315.

In this case, as in *Quick Point,* the parties anticipated that the device might not be patentable by providing for renegotiation of the royalty if a competitive product entered the marketplace, and mandatory arbitration if the parties failed to agree. Although the contract itself does not set forth distinct royalty rates depending on the validity of the patent, it takes the more flexible, and equally valid approach, of requiring the parties to renegotiate a fee depending on the validity of

the patent. If this court were to invalidate the assignment agreement, then it would be obliged—under the logic of the hybrid royalty cases—to award plaintiff relief tantamount to the renegotiation mechanism provided by the agreement. The assignment contract in this case is not a classic hybrid agreement—it is not an agreement wherein patent and non-patent consideration are hopelessly entangled. On the contrary, the contract fixes the value of the non-patent rights precisely, at the amount of the royalty rate that would be renegotiated in the event of patent invalidity. This court concludes that *Lear* does not bar enforcement of the agreement as interpreted by plaintiffs.

### 5. *The Contracting Parties' Intent*

Under the law of the case, both defendant's interpretation of the termination clause, and plaintiff's interpretation, are, standing alone, plausible enough for a jury to credit. What the court has done until this point is to reject defendant's legal argument that, if plaintiff's interpretation were accepted, the agreement would have to be voided for conflict with patent law policies. It remains to be seen whether plaintiff's interpretation is, as plaintiff insists, compelled as a matter of law by the undisputed evidence showing the contracting parties' intent.

#### a. *The extrinsic evidence*

■ Plaintiff argues that based on the undisputed evidence in the record, the termination clause should be construed to preclude the assignee from continuing to manufacture the device without paying a royalty fee after terminating the contract. In support, plaintiff points to the affidavits of four individuals: Dr. Sacks, the inventor and the sole negotiator on behalf of the assignor; Norman I. Jacobs, a lawyer consulted by Dr. Sacks during the negotiations; Robert Anderson, the general counsel and a negotiator on behalf of the assignee; and Joseph A. Ciffolillo, a lawyer for the assignee responsible for the original drafting of the agreement.

Dr. Sacks states that his contemporaneous understanding was that the termination clause was to be invoked only "in the event that they [the assignee] no longer wanted to manufacture that particular item." Expand-

ing on this theme, he claims to have understood the agreement to mean "that if they [the assignee] no longer wanted to produce it [the enteral feeding device], they could give it back to me and I would be free to take it to some other company, but that would have meant they no longer would produce it." Plaintiff's Exh. N. This is confirmed by attorney Jacobs. Jacobs maintains that Dr. Sacks came to his office during the period negotiations were in progress, showed him the contract form, and suggested that it meant that "if they [the assignee] terminate the agreement, they don't sell his products anymore." Jacobs further states that, at that time, he communicated to Dr. Sacks his agreement that this was the natural construction of the agreement. Plaintiff's Exh. L.

Surprisingly, this accords with the statements of general counsel Anderson, a representative of the other contracting party. Anderson states that his contemporaneous understanding of the agreement was that, in the event of termination, the assignee "would stop making the products." Further, he states that, although "the intention of the words" was that the assignee could terminate for any reason, "that does not indicate that we could continue to manufacture the product if we terminated." Plaintiff's Exh. J.

Ciffolillo, also representing the original assignee, had this to say when asked about his understanding of the obligations of the assignee upon termination under the agreement:

I can only answer that question by telling you what we have done in similar situations.... In similar situations where there was not a viable business opportunity, we returned the product, we returned the patent, we returned the rights, the use of the name—we returned everything associated with the project back to the developer, and very often, if asked, helped him relocate the project with another company that was perhaps in a better position than we were.... [W]e have never terminated an agreement and continued to pay and

continued to market that product without paying a royalty.

Plaintiff's Exh. K.

Dr. Sacks and Mr. Anderson both speak to the contemporaneous understanding of the contracting parties. Dr. Sacks's affidavit is buttressed by Jacobs's corroboration. Anderson's affidavit is highly credible, because, since Microvasive sold the product line to defendant, he has no interest whatsoever in the outcome of this litigation. Furthermore, while Ciffolillo does not speak directly to the contracting parties' intent, the interpretation of Sacks and Anderson is bolstered by his statements regarding the customary understanding of the contract language employed. *See Boston Five Cents Savings Bank v. Secretary of H.U.D.*, 768 F.2d 5, 9 (1st Cir.1985) (approving the use of "evidence showing what [the disputed contract] language is customarily taken to mean" as an aid to interpretation).

b. *What to make of the extrinsic evidence*

Plaintiff stresses that Sacks and Anderson—representing the assignor and the original assignee respectively—are in accord as to the meaning of the agreement with respect to termination. This is a highly unusual situation in a contract dispute, and there is some difference of opinion as to its implications.

Williston's strict objectivist approach holds that "it is not the real intent but the intent expressed or apparent in the writing which is sought." 4 *Williston on Contracts* § 610, at p. 503 (3d ed. 1961). But under Corbin's subjectivist theory, "a party should be permitted to determine the operative meaning of the words of agreement by proving that both parties so understood them." 3 *Corbin on Contracts* § 538, at pp. 59–61 (2d ed. 1960). The Restatement has essentially adopted Corbin's view: "Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." *Restatement (Second) of Contracts* § 201(1); *see also American Cas. Co. v. Baker*, 22 F.3d 880, 887 (9th Cir.1994) (quoting Restatement rule).

The leading modern authority suggests that—in the rare case where evidence shows the two parties to an agreement to have a common understanding of a disputed provision at the time of contracting—the Corbin–Restatement–subjectivist rule has prevailed. *See* 2 *Farnsworth on Contracts* § 7.9, at p. 246 (1990) ("Such authority as there is supports giving effect to a common meaning shared by both parties in preference to an objective meaning."). For instance, the Third Circuit has held that where "there is no dispute between the contracting parties over the meaning of the terms, extrinsic evidence should [be considered] ... as providing an explanation of the parties' contractual understanding. Their harmonious recital of what these words mean is conclusive." *Sunbury Textile Mills v. Comm'r*, 585 F.2d 1190, 1196 (3d Cir.1978); *see also Berke Moore Co. v. Phoenix Bridge Co.*, 98 N.H. 261, 269, 98 A.2d 150, 156 (1953) (similar).

Defendant cites us to a slew of First Circuit opinions citing the general principle that " 'contracts depend on objective manifestations of consent and not on uncommunicated subjective expectations.' " *See, e.g., Sheinkopf v. Stone*, 927 F.2d 1259, 1268 (1st Cir. 1991) (citation omitted). But none of these cases involves the situation where there is consonant evidence of *both* contracting parties' intent. The cases cited can help defendant only if they are read to suggest a strict adherence to the objectivist theory of contract interpretation in Massachusetts.

■ For three reasons, the Court concludes that the undisputed evidence as to both the contracting parties' subjective intent controls the interpretation of the ambiguous contract terms. First, it should be recognized that the "objective manifestation" rule derives from the Restatement, *see* § 2, comment b, where it coexists happily with the subjectivist rule on parties in agreement. Second, although there is no Massachusetts case exactly on point, Massachusetts does permit the introduction of extrinsic evidence to prove the parties' intent where contract language is unclear. *See, e.g., Andover Newton Theological School, Inc. v. Continental Cas. Co.*, 930 F.2d 89, 94 n. 5 (1st Cir.1991) (under Massachusetts law, admitting extrin-

sic evidence to prove parties' intent where contract language was unclear); *Robert Inds., Inc. v. Spence,* 362 Mass. 751, 753–54, 291 N.E.2d 407, 409 (1973) (announcing rule that "[w]hen the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading up to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms").

■ Third, contracts should be given a construction that will make them rational business documents and effectuate the intent of the parties. *Fay, Spofford & Thorndike Inv. v. Mass. Port Auth.,* 7 Mass.App.Ct. 336, 343–44, 387 N.E.2d 206, 211 (1979). If a contract "as a whole produced a conviction that a particular result was fixedly desired although not expressed by words, that defect may be supplied by implication and the underlying intention ... may be effectuated, provided it is sufficiently declared by the entire instrument." *Bernard v. Cameron & Colby Co. Inc.,* 397 Mass. 320, 322, 491 N.E.2d 604, 605–06 (1986) (citing *Dittemore v. Dickey,* 249 Mass. 95, 104–105, 144 N.E. 57 (1924)). The record demonstrates that the contract would not effectuate the intent of the parties if it gave defendant the right to manufacture the device and perpetual right to use the trademarks of Sacks and Vine without *any* royalty fee at all. As Judge Woodlock so aptly said:

> If Abbott's literal reading of 9(a) is correct, it can escape *all* of its obligations under the contract—to pay royalties—by giving back to Baladevon only *part* of the consideration it received—the doubtful patent themselves—rather than the full package of marketing and ownership rights. Abbott argues, in effect, that Article 9(a) permits duties while retaining the contractual duties while retaining its contractual right to market the device. Such an unequal and unilateral right to change the essential nature of the agreement arguably runs counter to the spirit of this bargain.

Memorandum and Order at 16.

It is true that Judge Woodlock noted in dictum that, even if he were to convert the motion to dismiss then pending into one for summary judgment, and consider plaintiff's affidavits, the contract would in his view remain ambiguous. Memorandum and Order at 4 n. 1. However, Judge Woodlock was not privy to the Anderson affidavit, representing the contemporaneous intent of the assignee. We agree that evidence of the contemporaneous understanding of the assignor, standing alone, would be unpersuasive.

In light of the undisputed extrinsic evidence considered at the summary judgment stage, there is no genuine issue of material fact as to the parties' intent. Heavily swayed by the contracting parties unanimity, this Court heeds the plaintiff's entreaty.

### 6. *Relief*

Plaintiff asks this Court to assess damages by mandating a royalty fee of 7.5 percent (the upper range of the royalties permitted in the agreement after 1990) and ordering an accounting. The agreement, however, requires the parties to renegotiate the royalty fee in the event a competitive product enters the market place. Accordingly the royalty rate requested in Count II is inappropriate. The request for an accounting is allowed.

### *ORDER*

Defendant's motion for summary judgment (# 61) is ***DENIED.*** Plaintiff's motion for summary judgment (# 67) is ***ALLOWED*** on Count I in the amount of $37,176.00. The Court ***ALLOWS*** Plaintiff's motion for summary judgment on liability on Counts II and III. The parties are ordered to negotiate a royalty fee within three months, and submit any dispute to binding arbitration by April 30, 1995.[3] Defendant is ordered to provide an accounting concerning sales of the device from July 15, 1989 until December 31, 1994.

---

**3.** The Court rejects any argument that defendant waived its right to arbitration in light of the complex contract and patent issues raised in this litigation.